UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 21-CR-128 (APM) |
| | ) | |
| JESSICA WATKINS | ) | |

## JESSICA WATKIN'S MOTION FOR RELEASE TO HOME CONFINEMENT PENDING THE OUTCOME OF HER CASE

### INTRODUCTION

Jessica Watkins, through counsel, respectfully opposes the government's motion for detention in this case and seeks her release on conditions of home confinement and whatever other conditions the Court deems appropriate pursuant to the Bail Reform Act, 18 U.S.C. § 3142. The government's rhetorical flourishes aside, there is insufficient evidence to demonstrate that Ms. Watkins would be either a risk of flight or a danger to her community if she were released on stringent conditions. To the contrary, given her history and characteristics, there is every reason to believe she would abide by any conditions set in her case. She must be judged not by her "professed belief[s]" but by her actions and her history of law-abiding behavior. She has no prior criminal convictions and has honorably served her country in the military, including a tour in Afghanistan. Ms. Watkins is at particular risk in custody as discussed below.

Ms. Watkins is charged by indictment with Conspiracy, in violation of 18 U.S.C. § 371; Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. § 1512 (C) (2) and 18 U.S.C. § 2; Destruction of Government Property and Aiding and Abetting, in violation of 18 U.S.C. § 1361 and 18 U.S.C. § 2; and Entering and Remaining in a Restricted

1

Building or Grounds, in violation of 18 U.S.C § 1752(a) (1).  Each of these alleged offenses stem from the events at the U.S. Capitol on January 6, 2021.

As noted, Ms. Watkins has no history of violence and no prior convictions.  She did not use any force or violence or threaten any person in the Capitol or on the Capitol grounds on January 6, 2021.  She did not vandalize anything in the Capitol, or engage in any destruction of property, and in fact, encouraged others not to vandalize; she did not search for Members of Congress; she did not harass any police officer, but spoke with several officers and followed their orders; she participated in medical rescue operations for injured people during the event.

When Ms. Watkins learned that she may be wanted for questioning, she turned herself in and cooperated fully with law enforcement.  Notably, when the government asserts in its motion for detention that Ms. Watkins was arrested on January 17, the government neglects to point out that this was when she turned herself in to local police.  The warrant for her arrest occurred on January 16 but remained under seal.  However, when she got word that she was wanted, she did not flee, destroy evidence, or commit any violent act, but rather drove nearly 8 hours to turn herself in to Ohio law enforcement.  When she did so, local police were not even aware that an arrest warrant had been issued as it was not in the LEADS system.  However, when she heard from others that the FBI was interested in speaking with her, she drove back to Ohio and turned herself in – not the action of someone who would be unwilling or unable to abide by release conditions.  In short, the government cannot demonstrate by a preponderance of evidence that Ms. Watkins poses a flight risk or by clear and convincing evidence that no combination of conditions could assure the safety of a person or the community. Therefore, the law requires Ms. Watkins' release with conditions that will reasonably assure the safety of the community and her return to Court for future proceedings

Ms. Watkins requests that the Court fashion conditions which would require that she remain at her home, which is an apartment on top of her small business; that she reside in the third party custody of her partner who has agreed to undertake that role; that she submit to the installation of electronic GPS location monitoring; that she not possess a firearm, destructive device, or other dangerous weapon; that she refrain from traveling to the District of Columbia, except as directed by the Court; that she remain within her home district at all times except by prior permission of the Court; that she avoid all contact, directly or indirectly with any person who may be a victim or witness in this case, including her co-defendants except through counsel; that she submit to the supervision of the Pretrial Services office as directed; that she submit to home visits by law enforcement; that she work at her establishment which is connected to her home; that she not use alcohol excessively, and not use or possess any controlled substance; and that she submit to drug testing if required by Pretrial Services. Ms. Watkins agrees to abide by these and any other conditions the Court believes necessary to ensure her return to court and the safety of the community.

## STATEMENT OF FACTS[1]

Beginning in 2020, then President Trump told the public that the only way he could lose the presidential election was if the election was rigged. Trial Memorandum of the United States House of Representatives in the Impeachment Trial of President Donald J. Trump at 6.[2] After President Trump lost the election, he and other government officials said that the presidency had

---

[1] Counsel notes for the Court that she has had limited access to discovery in this case and thus relies largely on the government's arguments contained in its motion for detention and facts contained in media reports. While the government has provided limited discovery, due to technical difficulties, even that discovery has not been completely reviewed by Counsel prior to filing this motion.

[2] The Trial Brief can be found at https://judiciary.house.gov/uploadedfiles/house_trial_brief_final.pdf.

been stolen from him by widespread election fraud.[3] He held rallies designed to inflame his supporters. His supporters said he would invoke the Insurrection Act to use the military to ensure his continued presidency despite the election results, which they viewed as fraudulently reported in large measure because of the rhetoric of the President, his congressional supporters, and the right-wing media. The report of the potential invocation of the Insurrection Act took root in the online community of Trump supporters and led many local militias to believe they would have a role if this were to happen. Ms. Watkins was one of those people. In November, she believed that the President of the United States was calling upon her and her small militia group to support the President and the Constitution and she was ready to serve her Country in that manner. However misguided, her intentions were not in any way related to an intention to overthrow the government, but to support what she believed to be the lawful government. She took an oath to support the Constitution and had no intention of violating that oath or of committing any violent acts. While this does not excuse the actions of the people who engaged in violence on January 6, 2021, it demonstrates that Ms. Watkins is neither a flight risk nor a danger to the community. She recognizes that former President Trump is just that – a former

---

[3] *See id.,* Donald J. Trump (@realDonaldTrump), Twitter (Nov. 21, 2020 3:34 PM) (Watch: Hundreds of Activists Gather for 'Stop the Steal' Rally in Georgia https://t.co/vUG1bqG9yg via Breitbart News Big Rallies all over the Country. The proof pouring in is undeniable. Many more votes than needed. This was a LANDSLIDE!"); Donald J. Trump (@realDonaldTrump), Twitter (Nov. 24, 2020 10:45 PM) ("Poll: 79 Percent of Trump Voters Believe 'Election Was Stolen' https://t.co/PmMBmt05AI via @BreitbartNews They are 100% correct, but we are fighting hard. Our big lawsuit, which spells out in great detail all of the ballot fraud and more, will soon be filled. RIGGED ELECTION!"); Donald Trump Speech on Election Fraud Claims Transcript, December 2, Rev (Dec. 2, 2020) (But no matter when it happens, when they see fraud, when they see false votes and when those votes number far more than is necessary, you can't let another person steal that election from you. All over the country, people are together in holding up signs, "Stop the steal."); Donald J. Trump (@realDonaldTrump), Twitter (Dec. 19, 2020 9:41 AM) ([Joe Biden] didn't win the Election. He lost all 6 Swing States, by a lot. They then dumped hundreds of thousands of votes in each one, and got caught. Now Republican politicians have to fight so that their great victory is not stolen. Don't be weak fools!).

President- and she is committed to abiding by all laws of the United States and all orders of this Court.

President Trump instructed Americans to come to Washington, D.C. on January 6, 2021, for his "Save America" rally. On the day of his rally, he invited the citizens who had gathered to go to the Capitol: "We're going to walk down to the Capitol, and we're going to cheer on our brave senators, and congressmen and women" and "We're probably not going to be cheering so much for some of them because you'll never take back our country with weakness. You have to show strength, and you have to be strong." *Id.* at 14.   On January 5 and 6, Ms. Watkins was present not as an insurrectionist, but to provide security to the speakers at the rally, to provide escort for the legislators and others to march to the Capitol as directed by the then-President, and to safely escort protestors away from the Capitol to their vehicles and cars at the conclusion of the protest.  She was given a VIP pass to the rally.  She met with Secret Service agents.  She was within 50 feet of the stage during the rally to provide security for the speakers. At the time the Capitol was breached, she was still at the sight of the initial rally where she had provided security.  The government concedes that her arrival at the Capitol was a full 40 minutes after the Capitol had been breached.

Ms. Watkins did not engage in any violence or force at the Capitol grounds or in the Capitol. She did not vandalize anything, or engage in any destruction of property. She was polite to the police officers she encountered, and did not yell at or harass them.

It is critical to separate the natural emotional response to the events on January 6, 2021, and the law as it applied to Ms. Watkins' release or detention. There is no doubt that most people who watched what occurred on January 6, 2021 were shocked and dismayed about what they saw occurring and quickly formed opinions about the participants in the events of that day. And it is

5

easy to assume that people dressed as Ms. Watkins was, wearing "tactical gear," were there for bad purposes, but the Court must set aside those visceral reactions and judge Ms. Watkins by her own actions and intentions that day. The government's motion for detention is filled with rhetorical flourishes design to inflame the passions of its readers without supporting evidence, e.g., "Watkins single-minded devotion to obstruct though violence" p.1, "this was a moment to relish in the swirling violence in the air" p. 2, and references throughout to her attire as "camouflage." If one were truly trying to blend in for concealment reasons, military style clothing would not be the way to do that. Indeed, one can understand wearing defensive clothing given violence that has occurred at prior rallies. https://www.msn.com/en-us/news/us/stop-the-steal-protests-several-stabbed-23-arrested-as-protesters-and-counter-protesters-clash-in-washington-dc/ar-BB1bSzjK. The government also points to the fact that the group she is alleged to have been a part of walked up the steps in an "organized and practiced fashion." P 8. One can just as easily interpret this as a group that wanted to stay together in a large and unruly crowd.

It is important that the Justice system protect the rights of the accused regardless of the political views of the individual. Any decision about whether Ms. Watkins poses a substantial risk of flight or danger to the community must focus on whether she is likely to commit other crimes if released pending trial

## ARGUMENT

### A. The Applicable Legal Standard

The Bail Reform Act requires courts to release defendants who are pending trial on personal recognizance or on an unsecured appearance bond unless the government has presented clear and convincing evidence that there are no conditions that will "reasonably assure the appearance of the person as required or . . . the safety of any other person or the community." 18

U.S.C. §§ 3142(b), 3142(f)(2)(B). In other words, "the default position of the law . . . is that a defendant should be release pending trial." *United States v. Taylor*, 289 F. Supp. 3d 55, 62 (D.D.C. 2018) (quoting *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010)).

If the case involves a felony that is *not* a crime of violence but that involves the alleged possession of a dangerous weapon, upon motion by the government, the Bail Reform Act requires the court to hold a hearing to determine whether any condition or combination of conditions will reasonably assure the defendant's appearance in court and the safety of persons and the community, 18 U.S.C. § 3142(f)(1)(E); 18 U.S.C. § 3142(f)(2)(A). When imposing a condition, or combination of conditions, the court must select the "least restrictive" conditions. 18 U.S.C. § 3142(c)(1)(B).

Defendants who are charged with certain specified offenses are subject to a rebuttable presumption that no condition, or combination of conditions, can assure the defendant's appearance or ensure the safety of the community, *see* 18 U.S.C. § 3142(e), *but no such presumption exists here*. Rather, the presumption here is that the defendant will be released pending trial unless the government can prove by clear and convincing evidence that pretrial detention is the *only* means by which the community's safety can be assured, 18 U.S.C. § 3142(f)(2)(B); *United States v. Smith*, 79 F.3d 1208, 1209 (D.C. Cir. 1996), or can prove by a preponderance of the evidence that no conditions of release can assure the defendant's appearance at future court hearings. *United States v. Peralta*, 849 F.2d 625, 626 (D.C. Cir. 1988); *United States v. Hassanshahi*, 989 F. Supp. 2d 110 (D.D.C. 2013).

In determining whether the government has defeated the presumption for release by clear and convincing evidence proving that no combination of conditions can protect a person or the community, or by a preponderance of evidence that no combination of conditions can assure the

defendant's appearance, courts consider four factors: (1) the nature and seriousness of the offense charged; (2) the weight of the evidence; (3) the defendant's character, including his physical and mental condition, family and community ties, past conduct, drug and alcohol abuse, and criminal history; and (4) the nature and seriousness of the danger posed to any person by release.  18 U.S.C. § 3142(g). It is also important to consider the COVID-19 pandemic and its impact on Ms. Watkins should she be detained.

### The Nature and Circumstances of the Offenses Charged

The offenses charged are not crimes of violence. While violence was committed on January 6, 2021, and those responsible will be held accountable, that is not the issue before the Court in determining whether Ms. Watkins must be held in custody pending the outcome of her case. Rather the question is solely whether or not there are conditions that can reasonably assure the safety of the community and her appearance until this case is resolved in whatever manner it is resolved.   Here, the government has not presented any evidence that Ms. Watkins committed any violence.  Their evidence is that 40 minutes after the Capitol had been breached, she went to the Capitol and entered the building.  By that time, the door had already been opened.  The government acknowledges that "*the crowd* aggressively and repeatedly pulled on and assaulted" the doors of the building to get inside, causing damage.  Ms. Watkins is charged with aiding and abetting this offense, but there is no evidence that this was something she had a criminal intent to do.  She would have to have shared in the intent to destroy property, when in fact, she attempted to stop people from destroying property.  She talked of the beauty of the peaceful protest, but acknowledged that it was only beautiful until she started hearing glass break.  When she spoke of the beauty, she was referring not to the violence, but to the chants of USA and the singing of the National Anthem.

Ms. Watkins left the area of the Capitol well before curfew. On her way back to the hotel, she encountered MPD law enforcement officers and engaged in a polite conversation. She provided them with her name, phone number, address and all other information they requested. This is significant because it further demonstrates both her belief that she had not engaged in illegal behavior and her respect for law enforcement.

While the government argues that Ms. Watkins had weapons at her disposal, this cuts both ways. It means she presumably had a choice to take those weapons into the District of Columbia and onto the Capitol grounds and made a conscious decision not to do so. The government includes statements Ms. Watkins is alleged to have made about the election and the need to fight, kill, or die for rights and statements about being prepared to fight hand to hand. However, these statements if made, were made in November, shortly after the election in the wake of the then President's heated rhetoric about the election being stolen. They are not even alleged to have been made about the January 6 events. The statements were not directed towards law enforcement and are as easily interpreted as being prepared to encounter violent counter-protesters as they had on earlier occasions. And importantly, according to the government, Ms. Watkins made it clear that she would do nothing that was not specifically requested by the President. However misguided, this shows an intent to abide by the law, not violate it. Comments attributed to Person One on January 21, calling for continued actions cannot in any way be attributed to Ms. Watkins. She was in custody at that time, having turned herself in.

**The Weight of the Evidence Against the Defendant**

The evidence that Ms. Watkins was present on the grounds of the Capitol and inside the Capitol building is concededly strong. Whether the government can succeed in proving the elements of each of the specific offenses charged, however, is debatable. For example, 18 U.S.C.

§ 1752(a), entering and remaining in a restricted building, requires that the area be one that is . A "posted, cordoned off, or otherwise restricted." By the time Ms. Watkins allegedly entered the Capitol grounds and into the building, the doors were opened.  No police officer suggested that the building was restricted or that Ms. Watkins was required to leave. In any event, in determining whether conditions of release can ensure the safety of others, "[t]he weight of the evidence is the least important of the factors and the bail statute neither requires nor permits a pretrial determination of guilt." *United States v. Gebro*, 948 F.2d 1118, 1121-22 (9th Cir. 1991) (citing *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986)); *accord United States v. Jones*, 566 F. Supp. 2d 288, 292 (D.NY 2008).

The government's assertion that Ms. Watkins "joined a violent mob" to "forcibly stop the results of a Presidential Election from taking effect" is belied by the fact that she made no efforts to seek out lawmakers, she did not enter the Senate Chambers, she followed the instructions of law enforcement she encountered, and she helped to rescue and treat injured individuals.  While counsel does not yet have access to all of the discovery in this case, we have every reason to believe there is considerable exculpatory evidence including BWC footage of her interacting with law enforcement in a peaceful, law-abiding way, footage of her directing a protester to get off of a police swat vehicle, footage of her telling people not to destroy property, and footage of her providing medical assistance when needed. The government's assertion that her "specific conduct aggravated the chaos" is unsupported by the evidence. P. 17.

**The History and Characteristics of the Defendant**

"[A] defendant's past conduct is important evidence—perhaps the most important—in predicting his probable future conduct." *Pope v. United States*, 739 A.2d 819, 827  (D.C.App. 1999) (quoting *Cruz-Foster v. Foster*, 597 A.2d 927, 930 (D.C.1991)). Ms. Watkins has no prior

criminal convictions and was not under the supervision of any court on January 6th. She has never "exhibited an extremist anti-government ideology" as the government suggests. P.17. To the contrary, she is a former member of the military, voted for President Obama, and believes in the sanctity of the government and the importance of law and order, is committed to the safety of law enforcement officers. Members of her community have attested to her character as a law-abiding, productive member of society. (See Exhibit 1).

Ms. Watkins legally possessed the items found in her home . Any danger concerning the weapons has been obviated by removal of those weapons from her home  The Court can fashion release conditions that ensure no weapons are obtained or possessed – Ms. Watkins has voluntarily removed any such weapons and will abide by a condition of release that she not possess any firearms or other dangerous weapons.

Ms. Watkins has no prior history of violence and has tremendous respect for law enforcement and the Constitution of the United States. Indeed, although misguided, she believed she was supporting the Constitution and her government by providing security services at the rally organized by Mr. Trump and the republican lawmakers who supported his goals. Ms. Watkins opines that a thorough review of the video (not yet entirely available to the defense) will clearly demonstrate her apparent respect for law enforcement. The video and body worn camera footage will demonstrate that she spoke with law enforcement in respectful ways, indicating her support of law enforcement. And this is entirely consistent with her prior actions and prior statements. This supports the notion that if ordered by the Court to follow certain directives, she will be capable of following those instructions and complying with those orders.

While some of the rhetoric she allegedly engaged in is troubling, she fell prey to the false and inflammatory claims of the former president, his supporters, and the right wing media. For

example, she believed even after the events that occurred that the violence was not at the hands of people who shared her views, but were by agitators. She believed the right wing media's assertions that the violence was perpetrated by "antifa" or others. She called for charges to be filed against anyone who participated in the killing of the protester who was shot as well Officer Sicknick.

It is also important to consider Ms. Watkins personal circumstances and her particular susceptibility to violence or health risks during pretrial custody. Ms. Watkins was a ranger in the Army and served in Afghanistan. She has worked for a non-profit organization working on HIV prevention. She has served her community as a firefighter and EMT. She is a small-business owner whose business has suffered from the COVID-19 pandemic. She was forced out of the military after her sexual orientation was discovered. As a transgender female, she is at risk of harsh treatment in custody. Indeed, while in local custody, she was treated harshly. She had a documented injury to her arm, but it went untreated. She went on a hunger strike to get medical attention, but instead of medical attention, she was striped naked and put on suicide watch. As this Court is likely aware, suicide watch in the prison system is not designed to treat one's mental health issues, but is incredibly punitive. Ms. Watkins was left naked in a cell with lights on 24 hours a day for 4 days in full view of everyone else. In addition to the risks associated generally with being in the prison population, https://transequality.org/issues/police-jails-prisons, she also faces increase COVID-19 risks. https://www.washingtonpost.com/dc-md-va/2021/02/17/lgbtq-covid-cdc/.

## CONCLUSION

Bail conditions including home confinement, electronic GPS monitoring, and third party custody, would be sufficient to mitigate any risk to the community and to secure Ms. Watkins

appearance in court. For all of the reasons stated above, the Court should reject the government's request for pretrial detention and should release Ms. Watkins on restrictive home confinement.

              Respectfully submitted,

              A. J. KRAMER
              FEDERAL PUBLIC DEFENDER

                /s/
              _____
              Michelle Peterson
              Chief Assistant Federal Public Defender
              625 Indiana Avenue, NW
              Washington, DC 20004
              (202) 208-7500
              Shelli_Peterson@fd.org