UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **United States of America,**<br><br>v.<br><br>**Jessica Watkins,**<br><br>Defendant. | **Case No. 21-cr-028 (APM)** |

**MOTION FOR RECONSIDERATION OF DETENTION ORDER**

Jessica Watkins, through counsel, respectfully requests that the Court reconsider her request for release and order her released on strict conditions of home detention. "In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States. v. Salerno*, 481 U.S. 739, 755 (1987). The Bail Reform Act requires the Court to impose the "least restrictive" means of ensuring the appearance of the person and safety to the community. 18 U.S.C. § 3142(c)(1)(B). Only in "*rare* circumstances should release be denied," and any "doubts regarding the propriety of release should be resolved in the defendant's favor." *United States v. Gebro*, 948 F.2d 118, 1121 (9th Cir. 1991) (emphasis added). In light of newly disclosed exculpatory evidence and admissions by the government, reconsideration of the detention order would be appropriate, and an order of release can be fashioned that would reasonably assure the safety of the community. The government expressed several concerns over the release plan proposed by the defendant and those concerns are addressed in a revised release plan presented below.

**Background**

Ms. Watkins is charged by indictment with four counts: 1) conspiracy, in violation of 18 U.S.C. § 371; 2) obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2); 3)

1

destruction of government property, in violation of 18 U.S.C. § 1361; and 4) entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1). *See* Indictment, ECF No. 3. This Court ordered her detained pending trial after a detention hearing held on February 26, 2021. However, at that time very little discovery had been produced by the government, and while still only a small fraction of the discovery the government has has been produced, additional exculpatory discovery has been disclosed that bears directly on the question of Ms. Watkins' potential risk, or lack thereof, to the community were she to be released. That new information warrants reconsideration of the Court's earlier order.

**Legal Standard for Review**

As an initial matter, while the Rules of Criminal Procedure do not explicitly provide for motions to reconsider, such motions are properly entertained in criminal cases. *See, e.g., U.S. v Sunia*, 643 F. Supp 2d 51, 60 (D.D.C. 2009), *U.S. v Slough*, No. CR 08-360 (RCL), 2014 WL 3734139, *2 (D.D.C. July 29, 2014), *U.S. v Cabrera*, 699 F. Supp. 35, 40 (D. D.C. 2010). In deciding motions for reconsideration in criminal cases, the courts apply the same standard applicable in civil cases under F. R. Civ. P 59(e). *U.S. v Sunia*, 643 F. Supp 2d at 60 and *U.S. v Slough*, 2014 WL 3734139 at *2, and look at whether justice requires reconsideration. As the Court articulated in *Slough* at *2, "asking 'what justice requires' amounts to determining, within the Court's discretion, whether reconsideration is necessary under the relevant circumstances," citing *Cobell v. Norton*, 355 F. Supp. 2d 531, 539 (D.D.C. 2005). "Moreover, "[e]ven if the appropriate legal standard does not indicate that reconsideration is warranted, the Court may nevertheless elect to grant a motion for reconsideration if there are other good reasons for doing so." *Sunia* at 61, citing *Isse v American Univ.*, 544 F. Supp. 2d 25, 29 (D.D.C. 2008). Moreover, in the context of the Bail Reform Act, it is sufficient to show that there is

2

"information that was not known to the movant at the time of the hearing and that has a material bearing" on the detention question. *United States v. Lee*, 451 F. Supp. 3d 1, 5 (D.D.C. 2020). The existence of exculpatory evidence that undercuts the government's theory of guilt and the existence of exculpatory evidence that corroborates the defendant's theory of innocence, certainly meets that standard. Here, reconsideration is appropriate and in the interests of justice as Ms. Watkins' liberty interests remain at stake, and the facts known to the parties and thus the Court have changed, undercutting the arguments made by the government for her detention.

**Argument**

Ms. Watkins does not possess a risk to the community if released upon strict conditions of release. She has no interest in pursuing any political agenda. She has no interest in engaging in any militia activities. She has disbanded her "militia," has gotten rid of all firearms, has declared she is sickened by what happened in the Capitol on January 6, has rescinded her membership in the Oath Keepers, and has publicly declared she just wants to return home to a simple life. Additionally, she has now been advised that she has lost the lease for her business establishment and home as of April 1, 2021. Thus, the government's earlier concern that if released she would be working in an establishment where people consumed alcohol is no longer a concern. If released, she would not be returning to her prior life, but would have to start over. The government's concern about her residing above a bar with her fiancé has been addressed – she can instead live with her parents who have agreed to be third party custodians. She no longer possesses any firearms and has no interest in doing so. Her parents have confirmed that there are no weapons in their home, and they would ensure that that continues. To the extent that the Court is concerned about internet access, her father has also agreed to ensure that she

has no access to the internet. These conditions, coupled with home confinement and GPS monitoring would ensure the safety of the community.

At the time that this Court first considered Ms. Watkins detention, the government had a theory and an "understanding" of what happened, and the Court relied upon that "understanding". Now, a month later, the government (unlike the defense) has had the opportunity to review much of the evidence, and has corroborated much of what the defense proffered in its initial motion. Once the defense has the opportunity to review the video surveillance and the body worn camera footage, we are confident that much more of what was proffered in our original motion for bond will be corroborated. Importantly, the government has had to acknowledge that in many ways they have been unable to develop evidence that supports their theory of the case.

The government has produced signal chats and amongst the hundreds of messages in December and January, and has had to acknowledge that in those chats there is no evidence of any plan to stop the election, stop the certification process, or to impede Congress. The government has produced no evidence that the Oath Keepers as a whole, let alone the small group of people Ms. Watkins was with, had any intention of storming the capitol or breaking any laws on January 6, 2021. The indictment charges that Ms. Watkins planned with her coconspirators to forcibly enter the Capitol to stop, delay and hinder the congressional proceedings. They have produced no evidence to support these charges. They have asserted that the group had "an intent to unlawfully and corruptly obstruct a congressional proceeding," Caldwell Tr. At 35, but have pointed to no evidence to support that assertion.

- There was no plan to forcibly enter the Capitol or to stop the electoral process;

- There was no recruitment, planning military training or communications for the purpose of stopping the electoral certification process;
- There is no evidence that any of the "planning" was tied to the events at the Capitol as opposed to the rally that preceded it;
- There is no evidence that Ms. Watkins or her coconspirators caused any damage to any property.

Importantly, the government has acknowledged the following facts since the detention hearing:

1) "We do not have at this point someone explicitly saying, our plan is to force entry into the Capitol in order to stop the certification." Tr. Of Caldwell Hearing, p. 34.
2) "[T]he group discusses that weapons should not be brought, at the first instance, into Washington, D.C. because of the gun laws here . . ." Tr. Of Caldwell Hearing, p. 35.
3) Mr. Caldwell "offer[ed] to lie and say Ms. Watkins was with him . . . meeting with him not inside the Capitol at the time of the storming" but Ms. Watkins turn[ed] down that offer. Tr. Of Caldwell Hearing p. 45.
4) The government has verified that after leaving the Capitol area and before the curfew was imposed, Ms. Watkins and her group were stopped by police in the area she described, had an entirely peaceful encounter, were searched for weapons and had none, provided their identifying information and peacefully left.



Importantly, none of Watkins text messages with defendant Crowl suggest any plan to storm the Capitol or interfere with the certification of the election. In fact, several of the text messages discuss how they believed they were going there to provide security for Roger Stone, completely consistent with what Ms. Watkins has described as their purpose. The chatter on signal verifies that the plan was to provide security to the speakers and VIPs at the events, not to enter the Capitol. The government has in its possession the VIP pass Ms. Watkins was given to

provide security at the event. She was honored to have been asked and was excited to do it. That was her plan. The government's evidence is at best that they were prepared to defend themselves against violence – that is not the same as planning a coordinated attack. As the Court said, "I was convinced that it was a plan to execute an incursion on the Capitol building. You've raised some evidence that, I think, rebuts that notion." Caldwell Tr. At 41. The government's case is not nearly as strong as it has asserted.

https://www.wsj.com/articles/capitol-riot-cases-show-scant-evidence-of-advance-plans-to-breach-the-capitol-11615991681?st=llrsoql5dpheexi&reflink=article_email_share.

Ms. Watkins acknowledges that her situation is not exactly the same as Mr. Caldwell. Contrary to Mr. Caldwell, she entered the Capitol. However, her conduct in entering the Capitol is not why the Court held her. Her entry was a misdemeanor. The government has conceded they have no evidence that she engaged in violent activity. The government has conceded they have no evidence that she damaged property – they have specifically indicated that she and her group entered after the property damage occurred. That disclosure was made after the Court found the government was entitled to a hearing and a rebuttable presumption of detention based upon that offense. She has also readily acknowledged that she was a leader of her own militia. But, that was not illegal and sounds far more sinister than it was. The "militia" consisted of her and her boyfriend and at most 4 other people. The "training" the government refers to was training she gave her boyfriend. The recruitment was inviting a couple of other people to come along and provide security at the event.

The government presented a theory (without evidence) that there was a weeks long plan to invade the Capitol. There was no such plan, at least not as it related to Ms. Watkins. There was a plan to provide security at a rally – and it was that plan that Ms. Watkins referred to in the

"stick to the plan" comment she made. While the government implied this was close in time to other disturbing things said by other people, that was a leap with no evidence. The criminal complaint used (and continues to use with subsequent arrests of co-defendants) time stamps not from the zillo chats but from an NPR story to suggest a proximity in time that does not exist. The zillo chats when disclosed will show that these comments were not close in time. "Stick to the plan" meant continue to protect the speakers and lawmakers who had attended the rally, not to storm the Capitol. There was no plan to storm and thus no plan to stick to.

Looking at the specific actions of Ms. Watkins is important because of how her case compares to other persons the government has charged who have been released. The norm in the Capitol riot cases has been release, as it should be under the Bail Reform Act. And that has been true both in cases where people are alleged to have been members of organizations such as the Proud Boys, and in cases where defendants have engaged in more serious conduct, including violence, illustrating that they pose a far greater danger to the community than Mr.Watkins would pose. Below is a summary of some of those cases:

**United States v. Chad Jones, 1:21-mj-00076-ZMF**.

Mr. Jones was charged with, among other things, assault on a police officer with the use of a deadly or dangerous weapon or infliction of bodily injury. According to the government, Mr. Jones used a flagpole to repeatedly and forcefully strike and break the glass of the doorway where Ashley Babbitt was shot and killed as she climbed through a broken pane. Just before Mr. Jones started breaking down the glass, lawmakers and staff were seen on the other side of the doors from the angry mob, being evacuated. As described in the complaint, "[a]n officer inside the Speaker's Lobby, facing the door with a gun raised, can be seen at the [left] side of the video in the close vicinity of the doorway." As the officer points the gun and fires at Ms. Babbitt,

8

Jones could still be seen next to the door with the pole, just to the left of where Ms. Babbitt was shot. The government did not request Mr. Jones's detention and Magistrate Judge Harvey released him on special conditions.

United States v Vitali Gossjankowski, 1:21-cr-00123-PLF

Mr. Gossjankdowski has been charged with, among other offenses, assaulting a federal officer with a dangerous weapon (a Taser) under Section 111(b). The statement of facts in support of the complaint describes that an officer near Mr. Gossjankowski suffered a heart attack and was hospitalized after being Tased multiple times on the back of his neck. He is also charged with section 1752 offenses for being in restricted areas of the Capitol while carrying or using a dangerous weapon. The government did not object to his release.

United States v. Matthew Miller, 1:21-cr-00075-RDM

Mr. Miller was released subject to special conditions after being charged with 10 offenses, including assault on a federal officer under section 111(b) by discharging a fire extinguisher. He is also accused of using a crowd barrier fence as a makeshift ladder to scale the walls of the Capitol. Mr. Miller was also charged with offenses under section 1752 involving using or carrying of a dangerous weapon.

United States v. Rachel Powell, 1:21-mj-00197-GMH

Ms. Powell was charged with using a battering ram to break a large window of the Capitol so that she and the rioting crowd could force their way into the Capitol. The government also alleges that Ms. Powell used a bullhorn to direct rioters inside the Capitol toward lawmakers, seeming to have detailed knowledge of the floor plan. Among other charges, Ms. Powell is accused of entering or remaining in a restricted area with a dangerous weapon. She was released by Chief Judge Howell over the objections of the government

**United States v. Mark Leffingwell, 1:21-cr-00005-ABJ**

Mr. Leffingwell was charged with assault on a federal officer under section 111, as well as several counts under 18 U.S.C. § 1752(a) and 40 U.S.C. § 5104(e)(2). He allegedly pushed past a wall of law enforcement officers who were attempting to keep people out of the Capitol and then repeatedly punched an officer with a closed fist. In other words, he was part of the mob who actually breached the Capitol. The government did not object to Mr. Leffingwell's release on conditions.

**United States v. Christopher Alberts, 1:21-cr-00026-CRC**

Mr. Alberts was stopped on Capitol grounds on January 6, 2021, after the emergency curfew, when a law enforcement officer noticed a bulge on his hip that turned out to be a handgun fully loaded with 13 bullets. He also carried a spare magazine in a holster on his other hip and was wearing a bullet-proof vest. In his backpack, he was carrying a gas mask, a military-style meal-ready-to-eat (MRE), and a first aid kit. The government's oral motion to detain Mr. Alberts was denied and he was released.

**United States v. Matthew Council, 1:21-mj-00008-GMH**

Mr. Council is alleged to have forced his way through a police line inside the Capitol during which process he pushed a female uniformed Capitol police officer and had to be pepper sprayed. The government did not seek Mr. Council's detention.

To the extent that the Court is relying not on any violence perpetrated by Ms. Watkins – there was none, and not based upon a flight risk or obstructive conduct – there was none, membership in a group that was involved in the riot is not enough to demonstrate she would be a risk to the community were she to be released. Many members of the Proud Boys (of which she

is not one) or Oathkeepers (of which she acknowledges she was a member but no longer is) have been released, as noted below:

**United States v. Joseph Bigg**s, 1:21-mj-00126-RMM

Mr. Biggs is an admitted member of the Proud Boys, an extremist group described as a "pro-Western fraternal organization for men who refuse to apologize for creating the modern world; aka Western chauvinists." Mr. Biggs posted a plan on social media for the Proud Boys to go to D.C. on January 6, 2021, but not to wear their distinctive black and yellow, saying "we are going to blend in like you" (referencing Antifa). He is alleged to have been at the front of the crowd who breached the Capitol and to have entered the Capitol within 20 seconds of its breach. He appeared to have been wearing an earpiece and carrying a walkie-talkie for communication purposes (and presumably coordination with other Proud Boys) during the riot. He was released.

**United States v. Ethan Nordean**, 1:21-cr-175-TJK

Mr. Nordean is charged with conspiring with multiple other members of the Proud Boys and with obstructing congress, destruction of property and entering and remaining on restricted grounds. The government alleges that prior to January 6, he had social media posts that indicate he was planning in advance to organize a group that would overwhelm police barricades and enter the Capitol. He referred to his plan as a "war" and said "the police are starting to become a problem." Days after the attack, he disparaged the police calling them "honorable oath breakers" and said "if you feel bad for the police, you are part of the problem." That sentiment is the opposite sentiment held and expressed by Ms. Watkins.

**United States v. Nicholas DeCarlo and Nicholas Ochs**, 1:21-cr-00073-BAH

Mr. DeCarlo and Mr. Ochs are charged with conspiring with each other and other members of the Proud Boys to stop Congress's certification of the election results. According to

11

the government, Mr. Ochs is a founding member of the Proud Boys Hawaii chapter with the group's name tattooed on his arm. They allegedly engaged in planning and fundraising for the event and, on the day of the event, forcibly stormed past barricades. In a video on social media, DeCarlo stated that he came to DC to stop the vote counting. Another video of the two of them is titled "Twas the Night Before REVOLUTION!!!" They are alleged to have defaced the Memorial Door of the Capitol with the words "Murder the Media." Ochs is also charged with stealing flex cuffs from a Capitol police officer.  The government did not seek their pretrial detention.

And, as this Court is well aware, several of the Oath Keepers charged in this same case have been released.  Perhaps most surprisingly, the leader of the Oath Keepers who the government alleges planned everything, remains in the community. https://www.washingtonpost.com/local/legal-issues/stewart-rhodes-oathkeepers-capitol-riot/2021/03/09/2c3d7fd8-808a-11eb-9ca6-54e187ee4939_story.html.

Similarly, other "leaders" of the insurrection have been released.  See for example, *United States v. Gina Bisignano, 21-cr-00036-CJN*, where the government emphasized in its appeal of a release order entered in the jurisdiction of arrest, that Ms. Bisignano was an "instigator, a director, and an active participant in the violence, destruction and obstruction at the Capitol" on January 6 and was on the front lines of the crowd pushing against the police line, allegedly shouting through a bullhorn things like: "Everybody, we need gas masks! We need weapons! We need strong, angry patriots to help our boys!" Ms. Bisignano was ordered released.

Moreover, Ms. Watkins has publically expressed her remorse for having participated in the events of the day, despite the fact that that could be used against her in future proceedings.

She has disavowed the Oath Keepers, has disbanded her tiny militia, and has expressed how sickened she was by the things she has learned occurred on January 6. These were not the words of someone who poses an ongoing threat and are in stark contrast to many others. *See e.g., United States v. Jenny Cudd*, 21-mj-00068-TNM, where Ms. Cudd livestreamed a video in which she stated "fuck yes, I am proud of my actions, I fucking charged the Capitol today with patriots today. Hell, yes, I am proud of my actions." She later told a local news station during an interview, "Yes, I would absolutely do it again." The government did not seek Ms. Cudd's detention. In a detention appeal hearing earlier this week, Chief Judge Howell asked the government to explain how the defendant in that case was a continuing danger now (as opposed to on January 6) since that is clearly what is required by the Bail Reform Act. The government's response was telling – they asserted that the defendant in that case had obstructed justice, had lied to the FBI, and had never denounced his actions. *See United States v. Sibick*, 21-mj-297. None of those is true here.

        The defense submits that for all of these reasons, Ms. Watkins should be released under the strict conditions imposed, as they are sufficient under the Bail Reform Act to ensure the safety of the community.

                                            Respectfully submitted,

                                            A.J. KRAMER
                                            Federal Public Defender

                                            _____/s/_____
                                            Michelle Peterson
                                            Chief Assistant Federal Public Defender
                                            Federal Public Defender's Office
                                            625 Indiana Ave NW, Suite 550
                                            Washington, D.C. 20004
                                            (202) 208-7500