## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 21-cr-28 (APM)** |
| | : | |
| **KENNETH HARRELSON** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

## DEFENDANT HARRELSON'S RENEWED MOTION FOR RECONSIDERATION OF CONDITIONS OF RELEASE

1.     COMES NOW, the Defendant, Kenneth Harrelson, by and through counsel, Bradford L. Geyer, in the Defendant's Renewed Motion for Reconsideration of conditions of release, based on produced discovery that reflects unreasonable descriptions of conduct in the Fifth Superseding Indictment as compared to actual surveillance video.

2.     Most of the crimes alleged against Mr. Harrelson and others depend critically and foundationally on the false myth that the worst goals of the worst attendees were in fact shared by positively everyone who traveled to Washington, D.C. for demonstrations on January 6, 2021—that collectively, all attendees shared the same monolithic, undifferentiated goals—to assault police and break windows in the U.S. Capitol to disrupt a Congressional session—and that outside of this narrowly defined alleged intent, positively no one present was driven by any other goal or purpose. This foundation for these cases is logically untenable, particularly in light of growing indications that Government undercover agents and other "insincere" march attendees may have themselves engaged in criminal acts that produced much of the harm.

3.     The Court's risk analysis has been distorted by numerous factors.  These include the Government's embellishments to describe conduct Mr. Harrelson has never engaged in, and that has never happened in his presence.  Additionally, a review of the cases pending against those alleged to

1

have participated in the events of January 6th demonstrate that the conduct Mr. Harrelson is alleged to have committed does not warrant detention, even in the view of the government.  The government has not sought detention for those alleged to have encouraged the participation of others (e.g., by yelling "we need fresh people" – Stevens – 21-cr-00040; Morgan – 21-mj-00352); nor those who have wielded riot shields (Stevens – 21-cr-00040; Anderson – 21-cr-00215), or pushed against the MPD officer line (Stevens – 21-cr-00040; Stecher – 21-mj-00276), within the Tunnel.  The common denominator in these cases is that no one was injured.  But this is truer of Mr. Harrelson, who took zero aggressive actions.  Also released pending trial is Robert Scott Palmer (21-mj-00301), who has been charged with a violation of 18 U.S.C. § 111(b), and is alleged to have been depicted "throwing what appears to be a wooden plank at USCP and MPD officer protecting [the area outside the Tunnel of] the Lower West Terrace entrance.  Complaint*, United States v. Palmer*, No. 21-mj-00301, at 3 (D.D.C. March 12, 2021).  Palmer is also allegedly depicted "spraying the contents of a fire extinguisher at the officers and then throwing the fire extinguisher at them. . . [and then] picking up the fire extinguisher from the ground and throwing it at the officers a second time."  The government did not object to Mr. Palmer's release.

4.      As will be highlighted, the government has failed to show by clear and convincing evidence an articulable threat posed by Mr. Harrelson to the community, and the government is not entitled to his pretrial detention.  *See United States v. Munchel*, 2021 U.S. App. LEXIS 8810, at *17 (D.C. Cir. March 26, 2021) ("The crux of the constitutional justification for preventative detention under the Bail Reform Act is that, '[w]hen the Government proves by clear and convincing evidence that an arrestee presents an *identified and articulable threat* to an individual or the community, . . . a court may disable the arrestee *from executing that threat.*'"  (emphasis added) (*quoting United States v. Salerno*, 481 U.S. 739, 751 (1987)).

5.      Moreover, The Government seems to completely disregard the First

Amendment to the United States Constitution,[1] and it seems at least possible that defendant was specially selected for arrest and prosecution due to his exercising his lawful rights pursuant to the Second Amendment to the United States Constitution.

6       It is rather cause for alarm to see no hesitation in charging a statute in a massively escalated way such that attending a First Amendment protected rally is suddenly an element of a 20-year statute (that was never intended to be used outside the investigative committee context). This statute, having been improperly invoked by the Government, improperly imputes a presumption of criminal intent upon anyone too close to the Capitol or inside it on January 6th, while also vastly expanding "corruptly" into a general crimes definition.  Very convenient for charging theories based on fully extended aiding and abetting theories that   encompass common crimes like vandalism.

7.       Also, conditions and restrictions make it virtually impossible to properly prepare for trial.  If proximity were the challenge, undersigned counsel would happily move to the District for a few months where he maintains warm friendships and business contacts.  But reaching Mr. Harrelson on a productive basis is not possible.  Preparations come in 30-minute increments at odd times where counsel drops everything to answer the phone.  Those calls stopped last week when an upsurge of inmates made the phone unavailable and the jail was disrupted by investigations and inspections.

8.       As Michelle Peterson explained to this Honorable Court on October 14, 2021, the Government is providing discovery on an extended timetable using a number of on-line viewing platforms that defendant cannot as of now review unsupervised in a meaningful way, and only under strict conditions while supervised.  The current "solution" forces defense counsels to find items of interest and then sign up to authorize selective defendant review so

---

[1] ECF 465 pages 2-11, 18-20.

all discovery review that could be engaged in by defendants bottlenecked and piecemealed behind the law firm's system of review. The update provided by the Government on November 5, 2021,[2] is encouraging in providing some future semblance of a meaningful discovery review system although jail conditions continue to severely impact Harrelson's physical and mental state and it remains to be seen if the latest accommodation is sufficient.

9.     In a prior minute order, this Honorable Court cited the extremist nature of the Oath Keepers, which was based on assumptions or an incomplete record provided by counsels on both sides.[3]  In this minute order, the Court also referred to Mr. Harrelson's post-January 6th conduct which was, in all respects, legal and lawful and seemed to rely on a selectively edited election night text message exchange between married co-defendants that did not involve him.[4]

10.     This Honorable Court decided prior detention issues based on considerations about safety of public officials based on an incomplete and, in most respects as relating to Defendant, an inaccurate record.  Defendant should be released immediately *with reasonable conditions*.  He is not a flight risk; he is not now, nor has ever been a threat to the community or to the country.

11.     Mr. Harrelson is also a disabled veteran.  While on maneuvers to prepare for an Afghanistan deployment, he fell two stories and broke multiple vertebrae in his back.  He was medically discharged and to this day endures tremendous pain from his injuries incurred in the line of duty.  As with all back injuries, lack of exercise under conditions of confinement has been a challenge.  In another incident, while serving as team leader, Harrelson was tasked with breaking down the trucks to prepare for deployment and had ordered some military members (SMs) to pull straps off the trucks.  One of the SMs asked to go up into the truck to dismount one

---

[2] ECF 481 pages 4-5.
[3] ECF, September 17, 2021 Minute Order.
[4] ECF 431.

of the weapons, and Mr. Harrelson told the SM to stand by (wait).  Despite his orders, the SM

climbed up into one of the trucks to dismount the weapon.  The member lost her footing after

lifting the weapon and fell backwards inside the truck.  When she fell, the SM accidently

disengaged the brake which caused a Light Medium Tactical Vehicle (LMTV) and Heavy

Expanded Mobility Tactical Truck (HEMTT) Wrecker to crush a soldier.  Mr. Harrelson rushed to

pull the vehicles apart and then tended to the crushed soldier, who was coughing up blood in a

fetal position before succumbing to his injuries.  Mr. Harrelson lived across the hall from his

deceased 19-year old buddy and lives daily with gruesome visuals.  As a result, he has struggled

ever since with Post Traumatic Stress Disorder (PTSD).

### A.    Legal Standard

12.    "In our society liberty is the norm, and detention prior to trial or without trial is the

carefully limited exception."  *United States v. Salerno*, 481 U.S. 789, 755 (1987); *see also United*

*States v. Taylor*, 289 F. Supp. 3d 55, 62 (D.D.C. 2018) ("The default position of the law . . . is that a

defendant should be released pending trial." (internal quotation marks and citation omitted)); *United*

*States v. Motamedi*, 767 F.2d 1403, 1405, 1406 (9th Cir. 1985).

13.    Under the Bail Reform Act of 1984, for a defendant charged with an offense meeting

any one of these criteria, the court "shall order" a defendant detained before trial if it "finds that no

condition or combination of conditions will reasonably assure the appearance of the person as

required and the safety of any other person and the community."  18 U.S.C. § 3142(e).  "In common

parlance, the relevant inquiry is whether the defendant is a 'flight risk' or a 'danger to the

community.'"  *United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019).  *Salerno*, 481

U.S. at 752.  "The crux of the constitutional justification for preventative detention under the Bail

Reform Act is that, '[w]hen the Government proves by clear and convincing evidence that an

arrestee presents an *identified and articulable threat* to an individual or the community, . . . a court

may disable the arrestee *from executing that threat.*'" *United States v. Munchel*, No. 21-3010, at 11 (D.C. Cir. March 26, 2021) (emphasis added) (*quoting Salerno*, 481 U.S. at 751).  "Therefore, to order a defendant preventatively detained, a court must identify an articulable threat posed by the defendant to an individual or the community," *id.* at 16-17, and "a defendant's detention based on dangerousness accords with due process only insofar as the district court determines that the defendant's history, characteristics, and alleged criminal conduct make clear that he or she poses a concrete, prospective threat to public safety."  *Id.*

14.     After meeting its burden of proving a specific articulable threat to an individual or the community, the government must then also subsequently establish, by clear and convincing evidence, "that *no* condition or combination of conditions will reasonably assure the safety of any other person and the community," 18 U.S.C. § 3142(f)(2), or, in other words, that pretrial detention is the *only* means by which the safety of the community can reasonably be assured.  *See United States v. Smith*, 79 F.3d 1208, 1209 (D.C. Cir. 1996).  The prosecution bears the ultimate burden of establishing that no series of conditions is sufficient to negate the risk of the accused's flight or dangerousness—by a preponderance of the evidence in the case of flight and by clear and convincing evidence in the case of dangerousness.  United States v. English, 929 F.3d 311, 319 (2d Cir. 2011); see also Stone, 608 F.3d at 946; United States v. Bell, 209 F. Supp. 3d 275, 277 (D.D.C. 2016) (citing, United States v. Simpkins, 826 F.2d 94, 96 (D.C. Cir. 1987)); United States v. Rodriguez, 147 F. Supp. 3d 1278, 1286 (D. N.Mex. 2015); United States v. Guerra-Hernandez, 88 F. Supp. 3d 25, 26 (D.P.R. 2015).

### B.     Mr. Harrelson Has Not Been Charged with a "Crime of Violence."

15.     A "crime of violence" includes "an offense that has as an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another" or

"any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." 18 U.S.C. § 3156(a)(4).[5]

16.     "In determining whether [a charged] offense is a crime of violence, courts look to the elements of the offense, not the real world conduct." *United States v. Singleton*, 182 F.3d 7, 11 (D.C. Cir. 1999).  "The term of art 'element of the offense' makes clear that a court need look no further than the statute creating the offense to decide whether it describes a crime of violence." *Id.* at 11; *see also Mathis v. United States*, 136 S. Ct. 2243, 2250 (2016) (explaining that an "element" is something that the jury has to unanimously select or something the defendant must necessarily admit to be found guilty of the offense).  A statute cannot categorically be a "crime of violence" unless "the least of the acts criminalized" has as an element the "use, attempted use, or threatened use of physical force." *Montcrieffe v. Holder*, 569 U.S. 184, 191 (2013); 18 U.S.C. § 3156(a)(4).

17.     The principle of Ejusdem Generis is also pertinent in considering which offenses Congress intended to give rise to a detention hearing.  Specifically, "a general statutory term [is] understood in light of the specific terms that surround it." *Hughey v. United States*, 495 U.S. 411, 419 (1990), *quoted in United States v. Watt*, 911 F.Supp. 538, 545 n.5 (D.C. Cir. 1995).  For example, under section 3142(f)(1)(A), in addition to cases involving "crime[s] of violence," the government is entitled to a detention hearing where the defendant is charged with sex trafficking of children under 18 U.S.C. § 1591, or with a "Federal crime of terrorism" under 18 U.S.C. § 2332b(g)(5)(B).  In addition, the government is entitled to a detention hearing when the defendant is charged with an offense for which the maximum sentence is life imprisonment or death. *See* 18 U.S.C. § 3142(f)(1)(B).  Therefore, consideration of the *elements* of the offenses with which Mr.

---

[5] Section 3156(a)(4) also defines a "crime of violence" as any felony listed under chapter 77, 109A, 110, or 117, however it is undisputed that Mr. Harrelson has not been charged with any such offense.

Harrelson has been charged is necessary to ascertain whether the government was ever entitled to a detention hearing pursuant to section 3142(f)(1)(A).

18.     "The . . . question is whether the 'nature' of an offense . . . is such that a 'substantial risk' of violence arises 'in the course of committing the offense.'" *United States v. Singleton*, 182 F.3d 7, 10 (D.C. Cir. 1999).  "Case-specific facts are thus relevant at a detention hearing, but not when considering the government's motion . . . to hold such a hearing." *Id.* at 12.  "Absent a direct relationship between the offense and a risk of violence, the possibility of violence is not a basis for pretrial detention on a charge that[,] on its face[,] does not involve violence as an element." *Id.* at 14.  "[A] more precise relationship between charged conduct and future risk is necessary to," *id.*, demonstrate that an offense "involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."  18 U.S.C. § 3156(a)(4)(B).

19.     As the D.C. Circuit recognized in *Singleton*, the fact that a charged offense does not entitle the government to a detention hearing "does not deprive the government of an opportunity to detain [the accused] when other circumstances warrant."  182 F.3d at 16.  The Court goes on to note that the government can seek pretrial detention if the accused presents a flight risk or otherwise a risk "that such person will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror," 18 U.S.C. § 3142(f)(2), circumstances the government has not alleged here.

20.     There is no suggestion that the person alleged to be Mr. Harrelson attended the events of January 6th while armed with a weapon, and Mr. Harrelson himself was arrested without resistance.  Rather, the government would have this Honorable Court hold Mr. Harrelson to a standard higher than required by the Bail Reform Act—because he was a member of the Oath Keepers, present at the protest on January 6th, and inside the Capitol for approximately sixteen (16)

8

minutes.  (ECF 328, the 5th Indictment:  It is alleged that Harrelson entered the Capitol "at about

2:40 PM," and "exited the Capitol at 2:57 PM", par. 144, par. 159), although Congress recessed at

2:18 P.M. according to the Congressional Record. [6]

      **C.**      **Oath Keepers Are NOT—by any legitimate measure—extremist.**

     21.     Counsel very humbly and respectfully proposes that the Honorable Court, in

considering labels such as "extremist," deal in objective facts and evidence presented by the

Government, with no eye toward popular trends, opinions or perceptions, and thus as a perfect

reflection of Lady Justice.

     22.     Counsel believes this is especially important in light of the Government's use of the

word being a prolongation of its execrable abuse throughout history:  Two randomly elected

examples of this general rule are that the British Crown hated "extremist" turncoat Constitutional

Founders in the late 1700s and Hindu and Muslim nationalists despised that revered teacher of

nonviolence, the "extremist" Mahatma Gandhi. Exactly how much weight do American society and

the American judiciary put into the opinions of the past abusers of this ugly word?

     23.     History shows this word "extremist" can be (a) a political weapon designed to silence

any beliefs deemed destructive to a favored narrative or agenda; and also (b) *a slippery slope*.  Once

the Honorable Court sanctions the legitimacy and thus intended effect of the word—the restriction of

free speech of a few, even if popular belief holds that a certain group is entirely deserving of the

restriction, and should be silenced—who then is to say that the Honorable Court hasn't set precedent

for future free speech restrictions imposed upon those who are exuberantly favoring and celebrating

---

[6] The Honorable Court is respectfully invited to take judicial notice, in relation to the legal argument
on the question of an "official proceeding," that the House declared Recess at 2:18 PM.:
Congressional Record House Articles; Congress.gov; Library of Congress.  House of
Representatives - January 06, 2021.  Counting Electoral Votes—Joint Session of the House and
Senate held pursuant to the Provisions of Senate Concurrent Resolution 1; Congressional Record
Vol. 167, No. 4. https://www.congress.gov/congressional-record/2021/01/06/house-
section/article/H76-4; last accessed: November 10, 2021.

them now?  First Amendment rights must protect everyone, *not just those with whom we agree*.

24.     While private citizens can say whatsoever things they wish about political or religious ideas with which they disagree, officers of the Honorable Court have a solemn responsibility to resist the temptation to apply negative labels to political or religious groups who may be unpopular at the present time and in the current political climate.

25.     The conceptualization and visualization of Oath Keepers as extremists, and the use of such charged language, illustrates how the Government's (primarily Congressional) and news media's narratives about January 6, 2021 set the stage for dehumanizing Mr. Harrelson even before this matter was filed.  Broadly speaking, false narratives are an affront to our legal system and debase us as a civilization.  In this case, false narratives have also created an insidious backdrop that may have contaminated the risk analysis presented to this Honorable Court concerning critical decisions bearing on pre-trial detention.

26.     The Government cited to *Tanios* in its Opposition to Hackett's Motion for Release, ECF 344[7], to say "*Indeed, even in a recent order overturning a detention decision for a January 6 defendant, the D.C. Circuit noted that the defendant had "no ties to any extremist organizations.*" *United States v. Tanios*, No. 21-3034 (D.C. Cir. Aug. 9, 2021) (per curiam) (unpublished). However, the full quote of the D.C. Circuit when it ordered the release of Tanios, is:

> The record reflects that Tanios has no past felony convictions, no ties to any extremist organizations, and no post-January 6 criminal behavior that would otherwise show him to pose a danger to the community within the meaning of the Bail Reform Act. *Cf. Munchel,* 991 F.3d at 1282-84 (remanding pretrial detention orders where the district court did not demonstrate it adequately considered whether the defendants present an articulable threat to the community in light of the absence of record evidence that defendants committed violence or were involved in planning or coordinating the events of January 6).

---

[7] See ECF 344, p. 10, fn. 8.

*United States v. Tanios*, 856 Fed. Appx. 325, 326, (D.C. Cir. 2021). We set forth how the discovery now shows that Mr. Harrelson also has no past felony convictions, no ties to any extremist organizations, and no post-January 6 criminal behavior that would otherwise show him to pose a danger to the community within the meaning of the Bail Reform Act.

27. In the original minute order on September 17, 2021, this Court referenced defendant's membership in an "extremist organization" as a reason to keep him detained. While eradicating the scourge of actual extremism is a noble undertaking bearing on national security, there is no support in any record for the notion that the Oath Keepers is an extremist organization. With as powerful and negatively connoted word as "extremist," it is in the Government's and Honorable Court's interest to ensure such determination is not made and the label not applied in ad hoc fashion.



**COMMUNITY PREPAREDNESS TEAMS**

Oath Keepers' Community Preparedness Team (CPT) Project is working to make America strong again, from the bottom up, by having well trained, experienced military, police, and first responder veterans come together and lead the way in preparing their communities for any disaster, either natural or man-made.

Our teams can provide direct assistance to a community (as we did by guarding shops against arsonists in Ferguson, Missouri during the riots there), but they are first and foremost training cadre to train other groups and individuals in the critical skills they will need in any disaster:

**EMERGENCY MEDICAL**

Every American should be trained to at least "Combat Lifesaver" level to provide immediate care for victims of severe trauma, whether it be a car accident, a gunshot wound, a chainsaw accident, etc. to save lives. Our second level is EMT, and third level is medic/paramedic.

**EMERGENCY COMMUNICATIONS**

As the military saying goes, "if you ain't got commo, you ain't got jack." Communications are critical. Every American needs to have at least a hand-held HAM radio and the knowledge to use it for local communications. We then work to get you up to General Class level to talk to your whole state or the nation.

**SECURITY/TEAM TACTICS**

Most American gun owners have little or no training in how to fight together, as a team. Whether it is a husband and wife, father and son, or neighbors, you need to know how to move, shoot, and communicate as a team. Bad guys, like MS-13 or ISIS, attack in teams. You need to know how to fight back as a team and how to form up a neighborhood watch to protect yourselves and each other. Security is everyone's responsibility, and our infantry and police veterans will teach you how.

**EMERGENCY ENGINEERING**

In any emergency, whether it be during an ice storm, hurricane, tornado, earthquake, or aftermath of riots and social breakdown, you need shelter, clean water, alternative power, transportation and delivery of supplies, and the ability to deal with fire dangers and hazardous materials.



**GENERAL PREPAREDNESS**

Americans are told by FEMA to be able to self-rescue and self-supply for at least 72 hours, but clearly emergencies can last much longer. You need to be able to take care of yourselves and each other for extended periods, including effective food storage. We will show you how.

Even if you are not a veteran, you are welcome to join us and get trained, and then help train others. We find that nearly everyone has some skill or life experience that is useful to the community, and we will help you pick a training track to focus on, and get trained up by more experienced team member mentors. And even if you have physical limitations that would prevent you from being on a field team, you can still help with support, security as a "home guard," and logistics.

And if you already have an existing group, such as a neighborhood watch, church group, veterans group, political or social group, we would be happy to train your group in all of the above skills.

28.     The above flyer outlines some of the Oath Keepers goals.[8]  Nothing about the above flyer is inappropriate, unlawful or unprotected by the Constitution.

29.     Many Americans may find abhorrent the belief Mr. Harrelson is presumed to have held on January 6—that the vote count may not have been accurate—but assuming *arguendo* this was his belief, this does not make him an extremist, nor is an organization broadcasting such belief deserving of the "extremist" label.  Labeling citizens as "extremists" for holding unpopular opinions is to declare them unwelcome in society and to offend the notion that the American public square is a large marketplace of ideas wherein a free and open exchange of ideas is allowed.  The U.S. is not in the business of criminalizing, punishing or discouraging thoughts or beliefs.  Since the Indictment makes allusions to the military, even the nation's highest military court agrees with a narrowest interpretation of this principle, stating: "We must be sensitive to protection of the principle of free thought—'not free thought for those who agree with us, but freedom for the thought we hate.'" (*United States v. Priest,* 21 C.M.A. 564, 570 (C.M.A. 1972).  Even in the armed forces, wherein many freedoms are surrendered, unpopular speech cannot be punished unless it interferes with the military's ability to accomplish its mission (*United States v. Wilcox,* 66 M.J. 442 (C.A.A.F. 2008).

30.     The National Strategy to Counter Domestic Terrorism (NSCDT)[9] also sets forth: "It is critical that we condemn and confront domestic terrorism regardless of the particular ideology that motivates individuals to violence." (p.13)  Harrelson did not wish to be—and indeed, consequently, was not—motivated nor influenced to violence on January 6, 2021.  Even assuming *arguendo* that incitement to violence was a crime (under the law of the land, it is not, as a unanimous Supreme Court in *Brandenburg v. Ohio*[10] ruled that even advocacy of the use of force is constitutionally

---

[8] Oath Keepers, Community Response Teams, Pamphlet, 2020.
[9] https://www.whitehouse.gov/wp-content/uploads/2021/06/National-Strategy-for-Countering-Domestic-Terrorism.pdf (June 2021)

[10] 395 U.S. 444 (1969).

protected, unless specifically "directed to inciting or producing imminent lawless action."), one must wonder what the material effect was.  The Honorable Court might inquire what actual violence it was that Oath Keepers actually engaged in.  Can anyone find any?  More to the point, Mr. Harrelson NEVER engaged in any violence of any kind, and this is proven by the CCTV footage which the Government has not wanted to release to the public in its entirety.

31.     The NSCDT also reminds us that "...[t]he definition of "domestic terrorism" in our law makes no distinction based on political views—left, right, or center—and neither should we." (p.13)  Counsel submits that it ought to be likewise with the word "extremism"—that extremist behavior, insofar as it is "generally criminal," (p.13) be condemned and prosecuted, but only with a Lady Justice's perfect blindness as to political leanings, influence and intrigue.  The "extremist" label is not understandable in her pure conscience:  indeed it can only begin to become coherent when the blindfold is removed, such that one can see it is just a matter of one group subscribing to "political persuasion A" intending, with plainly disingenuous language, to tarnish those subscribing to "political persuasion B."  This tarnishing is boring and petty child's play, legally untenable and morally wrong.  It not a crime to believe Congress may not have received accurate information, and thus to fear that in reliance upon misinformation, it may not certify an election accurately.

32.     The NSCDT reiterates and further sets forth: "This Strategy focuses specifically on unlawful violence that poses a threat to public safety, to national security, and to the genuine free expression of ideas – indeed, to our democracy.  Our country and its laws leave wide open the space for political and ideological views and their articulation, including through peaceful protest.  But they leave no room for unlawful violence.  This Strategy is designed to preserve the former while preventing the latter." (p.13).  Harrelson believed he was engaging in "peaceful protest" within precisely that "wide open space," and that likewise and accordingly, an objective observation of his

13

conduct reveals no actions, let alone *mens rea*, necessary to sustain the Government's charges and no reasonable jury will vote to convict him.

33.    The Oath Keepers attestation from its website is illustrative:

> *"Oath Keepers is a non-partisan association of current and formerly serving military, police, and first responders, who pledge to fulfill the oath all military and police take to "defend the Constitution against all enemies, foreign and domestic." That oath, mandated by Article VI of the Constitution itself, is to the Constitution, not to the politicians, and Oath Keepers declare that they will not obey unconstitutional orders, such as orders to disarm the American people, to conduct warrantless searches, or to detain Americans as "enemy combatants" in violation of their ancient right to jury trial. See the Oath Keepers Declaration of Orders We Will Not Obey for details. Oath Keepers reaches out to both current serving and veterans to remind them of their oaths, to teach them more about the Constitution they swore to defend, and to inspire them to defend it. See below for details on how we do that. Oath Keepers also includes a membership program designated as "Associate Members", which consists of patriotic citizens who have not served in uniform but who serve now by supporting this mission with their Associate Membership and volunteer activities. Oath Keepers welcomes our Associate Members and appreciates their support of our mission."*

34.    Observations specific to this mission statement:

A.    It is not against the law to wish to preserve liberty and the rule of law, and to favor a humble Government.  None of these things signifies anarchist or extremist thoughts or actions.  Even if a clear definition for extremism were presented that both sides could agree on, and even if the Oath Keepers failed the test and thus (in accordance with an agreement as to definitions) were deserving of the label (because certain of its members engaged in conduct that crossed a "red line" threshold that was clearly delineated within the definition), it still would not implicate Mr. Harrelson as being likewise deserving of the label, nor responsible for extremist acts perpetrated by other members of the organization, assuming, *arguendo*, that they occurred or for anyone else on an aiding and abetting theory.

B.    While actions speak louder than words, and while courts should not rely solely or even predominantly on what an organization self-attests as to its mission and activities;

14

nevertheless, whatsoever things its membership involves itself in might be better understood by examining its mission statement; and it is fitting and proper that the "extremist" label derive from conduct observed and interpreted in as fair and impartial a manner as possible.

C.     No one says, "I love tennis, except for all its rules" or "I love my dog, except for the uniquely doglike characteristics."  Thus insofar as the Constitution built America, we can say that America is the Constitution—our founding document and supreme law, and to the extent it was unfinished, imperfect or inexact, it has been and can be further amended. Thus whatever one thinks about the Constitution is what one thinks about America, and thus, to wish to preserve and protect the Constitution is not an extremist thought, nor is rallying others to this same cause an extremist act.

D.     Those who wish to abolish the Constitution do not have the right to apply a label of "extremist" upon those who believe this document remains relevant.  In studying Oath Keepers, we observe that we have an organization that is wholly dedicated to a belief in the primacy of the Constitution.

E.     In the Government's assertion that the "extremist" label is applied fairly and accurately to this group whose members are unified by a belief in and admiration for our Nation's founding document, the Government is actually asserting and arguing that the Honorable Court, organized under the Constitution, should be abolished:  If reverence for the Constitution is extremist and bad, then *the abolition* of all things Constitutional is reasonable and rational and good.

F.     If the "extremist" label be applied fairly, it must plainly rest on and derive from something other than a reverence for liberty and Constitutional doctrine.

15

35.     The "extremist" label would be wholly appropriate in describing, for example, those committing violent acts arising from a belief that all men are NOT created equal and/or that people should NOT be judged by the "content of their character," but rather by the color of their skin.[11]

36.     For specific contemporary context, defending a political organization against the "extremist" label would not be warranted in the case of the Boogaloo movement,[12] because here, we have an anarchist group promoting civil war (with many of its members hoping to incite a "race war") and doing away with the U.S. Government altogether, **by stark contrast** to Oath Keepers who revere our Constitutionally organized U.S. Government and thus take such keen interest in the meaning of their oaths to it.

37.     The "extremist" label would also seem appropriate in describing religious persecution, including the scourge of anti-Semitic[13] and anti-Muslim[14] violence.  The brutal attackers of Harlem's pride, celebrated Japanese jazz musician Tadataka Unno,[15] are deserving of the "extremist" designation—for their anti-Asian hate, the senseless and brutal violence they visited upon the Japanese immigrant, and the discomposing and glaring moral turpitude which it signifies.

38.     If a clear majority of Americans openly professed unfailing support and reverence for the Constitution, those suggesting it was an outdated document might be called extremists.  But just as science has been wrong throughout history, so likewise do political climates change with the wind.  For this reason, the NSCDT is eminently wise in stating: "The definition of "domestic

---

[11] https://www.justice.gov/usao-wdwa/pr/washington-state-man-sentenced-federal-hate-crime-attack-sikh-man

[12] https://en.wikipedia.org/wiki/Boogaloo_movement; last accessed: October 31, 2021.
  https://www.justice.gov/usao-md/pr/baltimore-member-boogaloo-extremist-movement-pleads-guilty-illegal- possession-firearm; last accessed: October 31, 2021.

[13] https://da.lacounty.gov/media/news/pair-charged-hate-crime-attack-outside-sushi-restaurant; last accessed: October 31, 2021.

[14] https://www.dallasnews.com/news/2012/03/17/widow-daughters-of-man-slain-in-9-11-hate-crime-in-dallas-become-americans; last accessed: October 31, 2021.

[15] https://www.nytimes.com/2020/10/22/nyregion/jazz-pianist-attack-racism.html; last accessed: October 31, 2021.

terrorism" in our law makes no distinction based on political views – left, right, or center – and neither should we." (p.13)

39.      If anyone, for sheer dislike of opposing viewpoints, did not resist the temptation to demonize them as "extremist," counsel posits and believes the Government would agree, in a general context, that such labeling was improper, hollow, and unjustified.  In this of all nations of the world, opinions do not become and ought not to be labeled as "extreme" simply by our opposing them.  The Oath Keepers do not promote nor engage in violent acts.  Undersigned counsel could not find a single instance at an Oath Keepers Security Event wherein they as an organization or Mr. Harrelson as an individual engaged in violence, killed anyone even in legitimate self-defense, engaged in human trafficking, got arrested, discharged weapons, beat the innocent, ran drugs, or even failed to follow traffic laws.

40.      Seeing that the "extremist" label marginalizes and has the effect of stripping an individual's integrity and legitimacy in the public eye, those wishing to assert the dominance of the ruling majority may use the label to further disempower certain political opinions already in the minority, and the undersigned counsel implores this Honorable Court to make a fresh examination of the "extremism" tag which has insidiously landed too many Americans into virtual or physical solitary confinement, notwithstanding that they are unlikely to be convicted or to be sentenced to time served.

41.      To wit, the FBI keeps a list of extremist organizations:

     https://vault.fbi.gov/gangs-extremist-groups?b_start:int=0 (groups 1-20)

     https://vault.fbi.gov/gangs-extremist-groups?b_start:int=20 (groups 21-30)

42.      ***The Oath Keepers are not on this list*** because their various forms of support for the founding document of this country are not radical or extremist acts.  To the credit of the prosecutors in front of this Honorable Court, and the FBI agents working these cases, nobody thought to

17

influence FBI experts who study and track extremist groups that they should, belatedly, add the Oath Keepers to the above list to benefit the characterizations that are, in one word, "untrue."  When two controversial, political organizations badge another organization as "extremist," and there is a paucity of evidence to support such a finding through the lens of objectivity—when indeed not even the FBI, the world's foremost expert on extremist organizations, concurs—then Defendant Harrelson cannot be properly held on the basis that at one time he was a member of this group (or indeed, nor on the theoretical basis that he was a current, active member).

43.    That the Record is Devoid of Evidence that the Oath Keepers had an actual unlawful purpose in attending the January 6, 2021, "Stop the Steal" Event, unmasks the fact that the charged object of the conspiracy was in fact First Amendment-protected political speech, association and demonstration and was completely legal.

44.    The Government may shrug its collective shoulders and take no responsibility for mass unpersoning on Facebook, nor endless threatening messages received by family members of a charged defendant, but if the Government acted with perfection, how is it that State Officials saw something in how Government's framing of these charges to justify convicting Americans of treason before trial?  In just one example, on October 19, 2021, Florida's 12th Commissioner of Agriculture and Consumer Services proudly announced on Twitter, the nation's de facto wire service:

← **Thread**

 **Nikki Fried** ✔
@NikkiFried                                         •••

Today I'm announcing the suspension of six licenses of domestic terrorists who participated in the January 6 insurrection attempt against the United States.

That brings our total to 28 suspensions. As more charges are filed, we will continue to hold these traitors accountable.

8:10 AM · Oct 19, 2021 · Twitter Web App

18



While Commissioner Fried is not on trial, it is just one example of a public record replete with such examples causing one to wonder how anyone could think that the representative interests formulated in this venue could remain unscathed.

45.    Neither the passage of time, nor the difficulty encountered by interested parties in determining whether Park Police and/or Capitol Police issued official permits for "Stop the Steal" and similar events, nor the Government's improperly charging Section 1512—conflating intent to attend a Constitutionally protected protest activity with *mens rea* and elements of "obstruction of an official proceeding," a 20-year criminal statute—can hide the fact that the Indictment has grave deficiencies that must be factored into detention release risk analysis.

46.    Issuance of permits for a January 6th political demonstration and related security operations would be probative of exactly who was actually included in any conspiracy to engage in a *criminal* act, as opposed to those who "conspired" to attend a peaceful First Amendment protected demonstration.

47.    The central assumption crucial to the prosecution's case is that KENNETH HARRELSON conspired to leave the Presidency vacant for the next four (4) years.

48.     The allegation is that Mr. Harrelson knowingly and intentionally or purposefully agreed upon a criminal goal of having no President at all for the years 2021 through 2025, by stopping or obstructing the Joint Session of Congress for the certification of the Electoral College votes for President.

49.     Donald Trump could not have been re-elected if the count and certification of the Electoral College were obstructed.  To suggest these conditions could have led to Donald Trump's reelection is not credible.

50.     The Fifth Superseding Indictment Paragraph 57 states "On December 31, 2020, Tom Caldwell replied to a Facebook[16] comment, writing, 'It begins for real Jan 5 and 6 on Washington D.C. when we mobilize in the streets. Let them try to certify some crud on Capitol Hill with a million or more patriots in the streets. This kettle is set to boil...'"

51.     Indeed, the Fifth Superseding Indictment alleges in Count One and Two violations of 18 U.S.C. § 371 and §§ 1512(c)(2) that:

> did knowingly combine, conspire, confederate, and agree with each other and others known and unknown, to commit an offense against the United States, namely, to *corruptly obstruct, influence, and impede an official proceeding*, that is, the Certification of the Electoral College vote, in violation of Title 18, United States Code, Section 1512(c)(2).

52.     If indeed the defendant's purpose, by his protest activity, was to cause the Presidency to remain vacant or to install Speaker Pelosi in the honorable office, it would have undone everything President Trump's attorneys were working toward.  Assuming, arguendo, that such a preposterous plan existed, let alone if it could be established as having life in Harrelson's mind in absence of any evidence whatsoever, it utterly failed in its execution because what the Government calls the "storming" phase came too late,

---

[16] ECF 328. Harrelson did not have a Facebook account and could not access Facebook comments referenced in Fifth Superseding Indictment paragraphs 46, 48, 49, 55, 57, 61, 67, 68, 75, and 157.

and we now know that Congress was in recess.  We also know that it went into recess

for an entirely different reason than what is assumed, to wit, the Capitol had already

responded to reports of pipe bombs.[17]

53.     Arguing the legitimacy of votes submitted by various disputed States

would require the Joint Session of Congress to actually be meeting and in session.

54.     What's also mysterious is the question of why defendants who allegedly had this

intent brought their legally owned and licensed weapons and stored them legally outside of the

District where they could not be deployed for insurrection purposes, and were legally stored. Would

it not have been easier to engage in insurrection if they were heavily armed? If they knew what they

were doing was a crime before committing the crime, why wouldn't they have brought the essential

and necessary tools of the insurrectionist trade?

55.     Why did they carefully avoid violating D.C.'s gun laws[18]? All reasonable inferences

from their actions show they had no intent to engage in an insurrection and he certainly in all his

actions intended to comply with the law. The allegations preclude Harrelson's knowing and

intentional violation of 18 U.S.C. § 1512(c)(2).

56.     The protestors were unarmed at the U.S. Capitol, even while some incidentally

brought weapons (in case Antifa attacked them), yet left them in Virginia.   The Civil Complaint in

*Smith, et al. v. Trump*, *et al.*, Case 1:21-cv-02265-APM, based on primarily the same predicate facts

as to this Defendant, alleges that Oath Keepers intended to be security for Mr. Stone at the rally on

January 5-6.[19]   The only other significant "weapon" the Defendants could have had is numbers, but

they had no way of knowing what the numbers would be until they arrived at the Capitol.

---

[17] See ECF 465 pages 14-15.

[18] The Government's Detention Motion ECF 152 is littered with references to "high powered" gun
training (p.7 legal), "stashing" a firearm (p. 9-11, also legal), access to firearms (p. 20-21 also legal).

[19] Compl. at par. 23, p.10:  "STONE also worked closely with OATH KEEPERS, which provided a
security detail for him on January 5 and 6, 2021.

57.     Therefore, Mr. Harrelson "conspiring" to attend one of several First Amendment protected demonstrations as an escort for speakers, for security, or to demonstrate (all apparently under valid permits), and whose purpose was plainly to petition Congress for redress of grievances, and to influence Congress to certify the Electoral College vote using the accurate, correct vote totals from disputed states—all of this is extremely relevant to his *mens rea* in committing any crime.

58.     The Oath Keepers Are Not Extremist, Whether Providing Security or Engaging in Political Demonstration, they had a lawful purpose, and Defendant Harrelson's Detention Proceedings Were Prejudiced by Government's Prior Inflammatory Rhetoric and Exaggerations that Have No Relationship to Actual Facts.  There is No Evidence That Mr. Harrelson Planned to Forcibly Enter the U.S. Capitol or to Disrupt the Certification of the Election.

59.     Just as in Mr. Harrelson's initial detention hearing, the Government **has not presented** clear and convincing evidence that (a) the defendant presents an identified and articulable threat to an individual or the community; or that (b) **there are no conditions** or combination of conditions that will reasonably assure the safety of any other person and the community.  18 U.S.C. § 3142(e).

60.     The Government has presented no evidence that Mr. Harrelson was a leader of a plan to forcibly enter the Capitol, or to disrupt the certification of the Electoral College vote.[20] Mr. Harrelson was not "among the [unarmed] 'stack'" of more than a dozen individuals dressed in camouflaged, paramilitary gear that moved up the stairs toward the Capitol building.

---

[20] ECF 152 p makes a conclusory statement in contravention of a fair review of the evidence: "Defendant Harrelson was a leader of this group of Oath Keepers who came to Washington, prepared to do violence, and then stormed the Capitol."



61.    Rather, he was standing off to the side of the "stack," wearing a T-shirt and baseball cap, singing the National Anthem among a swarm of people cheering them on as the stack followed the crowd into the Capitol. [21]    The videos and photographs also depict Mr. Harrelson being pushed toward the entrance along with a mass of other individuals, most of whom have not been and likely never will (nor ought to) be charged:

---

[21] Among government mistaken statements is a statement made in a detention hearing on April 12, 2021 characterizing Mr. Harrelson as yelling and waving (and inferentially directing the movements of "the stack") while he was standing on the Capitol steps with children, senior citizens, men and women who many now falsely accept as fact must have been  "insurrectionists and traitors" for mere presence on public grounds:

```
12            And we see, at around that time over the next
13    several minutes, that's when the remaining members of the
14    stack, the other dozen or so people who were part of this
15    Oath Keepers' stack, beeline up to Mr. Harrelson.  So
16    Mr. Harrelson is yelling.  And you can see in one of the
17    photos we included, his mouth is wide open, he appears to be
18    yelling and waving.
```

We now know from video that in actuality Mr. Harrelson was not directing "the Stack" but was instead singing the National Anthem; https://www.dropbox.com/s/zl3q5fx5e7eizwk/twitter%20video%20013481155306543147266.mov?dl=0



62.    Later, Mr. Harrelson was seen in photos and video footage walking with groups of people inside the Capitol building and in a photo standing peacefully inside the rotunda with his back to Graydon Young, attempting to photograph or video his surroundings:





63.    Other than his presence in the crowd of people entering the Capitol, the Government has offered no evidence that Mr. Harrelson engaged in unlawful activity inside the building.

64.    On March 15, 2021, at Defendant Harrelson's first detention hearing, Government counsel spun an inflammatory and defamatory yarn that has had resounding effects to this day:

> *"Furthermore, they were outfitted in clothing that had the Oath Keepers logos and insignia on it…"* [22]

As if our land had transformed itself into a new dystopian world wherein the First Amendment no longer existed.  This theme which the Government has built all of its pleadings around fashion choices that remind potential jurors of guns—in the only district in the country wherein legal gun ownership and gun ranges are virtually nonexistent.  The Government thinks that when dealing with political thoughts or opinions it deems unacceptable or threatening, it is invited to ignore the First Amendment with impunity, in a District that only recently, and begrudgingly, was

---

[22] ECF 152-1 page 33, Line 6.

forced into acknowledging the Second Amendment.[23]  Under our Constitution, people can dress

however they like, and massive indictments shouldn't make anyone suspect the Government

retained Lynn Yaeger as a consultant.

The prosecutor continued:

*"As the stack of Oath Keepers <u>and other members of the crowd </u>breached the Capitol and*

*damaged the doors to the Capitol."*

First, what the prosecutor improperly refers to as a "stack" is a method for moving VIPs or

speakers to stages through crowds; it's also used to rush to medically disabled, or to separate

adversaries in an altercation or to create space for emergency personnel.  Anyone who has attended a

crowded concert seeking to move through a crowd moves behind people moving in single file

because it is easier than moving abreast.  This is not a predicate criminal act.

65.     Use of the word "stack" is invalid because it refers, without exception, to members of

the armed forces ***carrying semi-automatic weapons***.  No one could know that from the agent

affidavit[24] supporting the original complaint, nor from any of the Government's filings since.

Google is your friend.[25]  There were no weapons on this day because there is no law that would

permit the Oath Keepers to bring defensive weapons to the District, and Oath Keepers follow the

law and respect law enforcement—an abiding and orienting principle behind the Oath Keepers.  This

---

[23] District of Columbia v. Heller, 554 U.S. 570 (2008).

[24] "Based on my training and experience, a stack or line formation is a tactical formation used by infantryman in the military. One defining feature of this formation is that members keep their hands on the backs or vests of the person in front of them to remain together while entering a room or weaving through a crowd. The purpose of maintaining direct physical contact with one another is to efficiently communicate with one another, especially in crowded or noisy areas." (ECF 152 1-1, pp. 6-7)

[25] https://www.google.com/search?q=military+stack; last accessed: October 31, 2021.
   https://dod.defense.gov/OIR/gallery/igphoto/2001779240/; last accessed: October 31, 2021.
   https://www.defense.gov/Multimedia/Photos/igphoto/2001472174/; last accessed: Oct. 31, 2021.

Government tendency to constantly harp on military themes and language to infer that guns were involved—in a District that has almost no legal guns in private hands—is curious, especially when they were safely and legally stored outside the District and had zero to do with any Oath Keeper activities on January 6th.  This inadvertently mimics intellectual dishonest and has the appearance of inflaming the passions of potential jurors who may be unfamiliar or inexperienced with the legality, utility, and responsibilities of legally owned firearms under the Second Amendment.

66.     Second, use of the word "breach" over and over and over is a mistake that has the effect of making deceptive and systemic use of language and presentation to destroy the humanity of my client, the Oath Keepers, not to mention the jury pool, through dishonest media coverage and even actions at the highest supervisory structural levels and almost certainly government representatives outside this room.[26]  The definition of "breach"[27], a transitive verb, is:  1: to make a gap in by battering: to make a breach as in breached the castle wall."  We now know from CCTV surveillance tapes that no one "breached" the East door of the Capitol.  ***The Door Was Open and It Was Opened Twice From the Inside by people who may have been invitees[28] who I learned last week from a media disclosure (over Government objections) may have been "welcomed in." by Capitol Police.[29]***  Eventually, two individuals pull benches away and are stopped by police[30] and a crowd (including seniors, women and others unlikely to have been involved in "breach" somewhere else) quickly fills the hall and they eventually open the door.

67.     Worse, the videotapes clearly show that Harrelson was not positioned to see or hear any damage to the door beforehand.   The Government's Opposition Motion to Reconsideration

---

[26] I draw attention to this Court's inquiry reflected in the March 23, 2021 Status Conference (ECF 100 pages 6 to 18)

[27] https://www.merriam-webster.com/dictionary/breach; last accessed: October 31, 2021.

[28] 7029 USCS 02 Rotunda Door Interior-2021-01-06_14h35min00s000ms @1:43

[29] ECF 465 Footnote 1 7029 USCS 02 Rotunda Door Interior-2021-01-06_14h19min00s000ms

[30] 7029 USCS 02 Rotunda Door Interior-2021-01-06_14h35min00s000ms @1:50

(ECF 152) does not describe the tapes accurately.  Harrelson is filming from his phone with an upstretched arm perhaps 3' over his head, and anyone can judge for themselves what he could or could not have seen or heard; although the phone itself did not have its view or sound blocked by people; nevertheless it does not and cannot definitely answer the question as to Harrelson's own awareness.[31]  So we are led to believe by the FBI affiant that the Oath Keepers deploy in a "stack" (without weapons of course, which makes it not a stack), Harrelson and the crowd deafeningly sings the National Anthem as "the stack" proceeds up the steps, but the entire crowd including Harrelson had perfect awareness of danger, able to see and hear everything through a dense mass of people, even though the Government has video proving the opposite:  The recording picks up no sound of battering, breaching, explosions, glass breaking—nothing.

68.     Later, one can see the crowd clumsily shuffling or lumbering toward the East Door, with no one person among the hundreds having any influence over the crowd's movement, which is typical and, for better or worse, describes the normal situation with crowds.  Crowds by definition feature limited visibility and limited situational awareness.[32]  Anyone not privy to an event happening deep in a crowd to the front, when a door opens and a zero pressure "whoosh" of air is discharged, would have concluded that the door was opened to let people inside.  Anyone on January

---

[31] IMG1399.

[32] The New Yorker: Crush Point: When large crowds, assemble, is there a way to keep them safe? January 30, 2011. https://www.newyorker.com/magazine/2011/02/07/crush-point; last accessed: November 2, 2021.  This article describes what happens when a large crowd is intent on entering a building.  The fact that a January 6, 2021 crowd of a hundred thousand people resulted in no crushing deaths, compared to a crowd of 2,000 wherein someone was crushed to death, is testament to the peacefulness and overall friendly cooperation of the January 6th crowd, and the fact that the crowd collectively felt no strong need to enter the Capitol at all.  *See also:* Modeling the effect of visibility on upstairs crowd evacuation by a stochastic FFCA model with finer discretization; October 1, 2019: https://www.sciencedirect.com/science/article/abs/pii/S037843711930980X; last accessed: November 2, 2021. "Visibility reduction shows significant negative impact on evacuation [or any desired movement by any individual in the midst of a crowd].  This is exactly why it is odd and out of character that the Capitol Security would be so thinly staffed on the day of such a large demonstration, especially in light of an unknown number of official, granted permits.

6th looking around at the senior citizens shuffling to the door would never have considered themselves part of a "breach," led by a military style "stack" because there never was any of this.

69.     It should not be the case that a few people moving bike racks from perpendicular to parallel positions could cause a peaceful crowd of thousands to advance forward, if Capitol Police standing on the other side of those racks intended the crowd to stay clear, and were there to prevent the crowd from coming closer.  Even if the racks had not been moved, they are not understood to be barriers designed to keep people from entering a space.  There are known effective crowd control measures that are well understood and seem to have all mysteriously failed, as if on cue, on January 6th.  Crowd psychology—potentially mindless and dangerous, yet also predictable—dictates that when a gap is opened, the crowd will move to fill the empty space.  Perhaps some at the front had knowledge of the secret of how all the bike racks were moved.  But beyond a handful of people at the front that arguably had knowledge, decisions made by the crowd after that are based on reasonable assumptions.

70.     On December 3, 1979, when British rock band The Who performed at Riverfront Coliseum (now known as Heritage Bank Center) in Cincinnati, Ohio, United States, and a rush of concert-goers outside the Coliseum's entry doors resulted in the deaths of 11 people, nobody got charged with crimes because it was understood that the act of trampling by a crowd was not the criminal responsibility of the thousands that trampled them, but a catastrophic failure of the venue's crowd control and security planning.  In other news, the application of the First Amendment and the requisite need for particularity can be juxtaposed against the history in front of Congress and protestors[33]

---

[33] In 2012, birthday-suit-clad protesters rushed House Speaker John Boehner's office when Seven naked protesters swarmed the office of Speaker John Boehner (R-OH) on Tuesday for some 20 minutes of loud chanting against cuts to AIDS funding.  *After police showed up and repeatedly threatened to arrest the protesters for indecent exposure, they eventually put on*

71.     From video, it is evident that Mr. Harrelson inches forward with the crowd,[34] trying not to push the person in front of him, as he almost sideways shuffles as a response to crowd movements and pressures.  Mr. Harrelson, it appears - had no choice but to enter the Capitol as he was basically carried over the threshold by the crowd.[35]  Contrast this with the earlier prosecutor's blatantly mistaken characterization:  "In the video Mr. Harrelson is in front of the group of the Oath Keepers [false], and it appears that he forcibly entered before them [false]."[36]  Later the prosecutor claims a law enforcement officer was pushed (how can one man have any influence on a crowd of hundreds jammed cheek to jowl when he is 30-40 people back?) and again specifically accused Harrelson of breaching the door, even though the evidence shows Mr. Harrelson "sideways shuffled" through it as the crowd enveloped him and slowly inched forward.[37]

72.     CCTV tapes show Defendant Harrelson in the Capitol for a total of 17 minutes, 16 minutes according to the indictment, acting totally respectfully and peacefully.  He is visibly so overcome with emotion with the majesty of the dome.  He tries to leave three times, and this is only after a group prayer. The surveillance tape looks like tourists at a museum.[38]  How many "extremist groups" have members who weep upon entering a hallowed building, overcome by the majesty of the Dome?[39]  How many, when asked "if they are OK" being observed to have collapsed weeping,

---

*their clothes and walked out of the Speaker's office.* The three female protesters stuck around in the hallway to speak to reporters and were arrested anyway; the four male protesters appeared to get away, the organizers said.  *Nude Protesters Arrested After Storming Speaker Boehner's Office, By Sahil Kapur, Talking Points Memo, TPM, November 27, 2012*, https://talkingpointsmemo.com/dc/nude-protesters-arrested-after-storming-speaker-boehner-s-office
[34] *Id.*
[35] 7029 USCS 02 Rotunda Door Interior-2021-01-06_14h35min00s000ms @5:40.
[36] ECF 152-1 page 33, Line 13-15
[37] 7029 USCS 02 Rotunda Door Interior-2021-01-06_14h35min00s000ms @5:40
[38] 0959 USC 02 Rotunda South-2021-01-06_14h15min00s000ms
[39] https://www.dropbox.com/s/2vecacofdvt1mow/IMG%201398%20OKs%20praying%20in%20rotunda%20projects.propublica.org%20parler-capitol-videos%20id%3DXZaaoVqC5BVQ.mp4?dl=0

stands back up and, wipe away tears affirms that they are in fact well, leading the viewer to understand that they were weeping in joy and fellowship and God's Grace, and then immediately drop back to their knees once again to lead the Oath Keepers in prayer?[40]

73.     Two other videos show Mr. Harrelson defending Officer Harry Dunn from angry protestors; or rather, Harrelson, upon seeing an overtaxed and understaffed uniformed officer with a gun dangerously at "the low ready," Harrelson engaged him in conversation to ease tensions and deescalate the situation at, at 2:45.[41]



74.     Mr. Harrelson, and other Oath Keepers, inserted themselves as a buffer between the opposing points of force, as Oath Keepers do.  Public photos, videos and grand jury testimony by cooperating defendants document this.  Notice the line, and notice their backs to Officer Dunn.[42]

---

[40] Id. 0959 USC 02 Rotunda South-2021-01-06  14h15min00s000ms@28:20
[41] https://twitter.com/CTExposers1/status/1431008411060252677?s=20; last accessed: Oct 31, 2021.
[42] https://twitter.com/CTExposers1/status/1427083534871797762?s=20; last accessed: Oct 31, 2021.



75.     Overt Acts are a good gauge of a charged defendant's level of involvement in a charged conspiracy.  We know from the Government that there were no incriminating signal chats prior to January 6th.

> Counsel,
>
> Attached please find a draft transcription of an excerpt of messages obtained from a chat in the Signal encrypted messaging application called "OK FL DC OP Jan 6."  This is a draft, and some of the times and content are subject to further editing.  The names of several of the participants have been redacted.  We are disclosing these messages to you because you will see that, prior to January 6, 2021, this chat does not contain any explicit references to a plan to forcibly enter the U.S. Capitol on January 6, 2021, and also because the government may reference some of the messages in response to Defendant Harrelson's bond review motion.  This document should be treated as SENSITIVE under the protective order.
>
> Please let us know if you have any questions.
>
> Jeff Nestler
>
> **Jeffrey S. Nestler**
> Assistant United States Attorney
> 555 Fourth Street NW, Wasington, DC 20530

76.     Indeed, in the 5th Superseding Indictment's Overt Acts (prior to January 6th), Mr. Harrelson is referenced in only four paragraphs with nothing to suggest direct criminality in any of the paragraphs themselves (39, 63, 77. 78).

77.     Paragraphs 63 and 67 allege participation involving non-descript behavior or action regarding mere presence in "GoToMeeting" meetings.  Paragraph 78's reference is to Harrelson's

role in providing security details and is a reference by someone else about him that is exculpatory and actually corroborates he was acting at all times completely innocently.  The Government has yet to produce a single piece of evidence regarding the purpose of these GoToMeeting meetings (other than allusion and conjecture), or to provide any clarity as to what was discussed in them. Attending a GoToMeeting must have similar magical, criminal liability-conferring properties as *mere presence* (i.e., "breaching") in the Capitol (as interpreted from available sealed surveillance tapes) or attendance at a "Stop the Steal" rally.

78.     However, the actual evidence suggests that the purpose of the GoToMeeting meetings was to organize security details for speakers at rallies, set to take place in Washington, DC on January 5, 2021, and the morning of January 6, 2021.  The Government has presented no evidence that Oath Keepers had anything to do with any of the violent events that transpired at the Capitol later that day, and which have been played on endless loop by the news media.

79.     The Oath Keepers provided security on January 5-6, 2021, although the discovery record seems somewhat scattered and not fully disclosed on this point, there were many Park Service and Capitol demonstration permits issued on this day suggesting substantial need for the speaker movements that the Oath Keepers provide.

80.     In other filings by the Government, the prosecution has conceded that members of the Oath Keepers frequently provide personal security details ("PSDs") at Trump rallies.  See e.g., Affidavit in Support of Criminal Complaint, *United States v. Joshua James*, Criminal No. 1:21-mj-00284-RRM, Dkt. 1-1 at ¶ 28 ("Your affiant is aware that certain Oath Keepers attended rallies in Washington, DC., held on December 12, 2020, to protest the results of the 2020 election –at which some Oath Keepers, to include Person Five, operated as a personal security detail for speakers at the events.") and ¶ 31 ("Finally, records indicate that, on or around January5, 2021 . . .

33

James, Person Five, and other individuals wearing apparel with the Oath Keepers name and/or insignia provided security to a speaker at the "Stop the Steal" events planned for that day.").

81.     In other words, the Government knew that Oath Keepers attended rallies in Washington, DC held on November 14, 2020 and December 12, 2020, wherein some Oath Keepers operated as a personal security detail for one or more speakers at the events, *Id.* at 10 ¶¶ 20-27, and that Oath Keepers also attended rallies in DC held on December 12, 2020, to protest the results of the 2020 election.

82.     In addition, "Kelly Meggs asserted, in messages sent to others before January 5-6, 2021, that the Oath Keepers would be providing security for speakers and VIPs at the events in Washington, D.C., on these dates." *Id.* at 10 ¶¶ 30.

83.     Similarly, during testimony at codefendant, Joshua James' Preliminary and Detention Hearing on March 11, 2021 FBI Agent Paul Jones testified that:

> Q.      "Okay. And in paragraph 27, you read that certain Oath Keepers attended rallies and that they were acting a person security details for speakers, correct?
> A.      "Correct.
> Q.      "It is not your allegation that acting as a person security detail is illegal, is it?
> A.      "No, not at all."

Transcript of Proceedings on March 11, 2021, pp. 39-40, *United States v. Joshua James*, 1:21-cr-00028 (N.D.Al.), Dkt. 142-1. So given that there were legal permits authorizing demonstrations and extensive threats by actual terrorist groups to disrupt the events that day, it makes makes eminent sense, nor is it in any way illegal, to have preparatory Go To Meetings.

84.     Although Harrelson had returned to his hotel soon after leaving the Capitol, sealed surveillance footage reveals the depth of the Oath Keeper's training, and their dedication to that training and to their reputation:  Two Oath Keepers are solicited by Capitol Police to help them enter the Capitol Building through a crowd of peaceful protestors, and to gather up and safely escort a line of Capitol Police officers from inside the building to the outside, through the massive,

seemingly impenetrable crowd.[43]  The Oath Keepers are seen to successfully render this service, exactly in accordance with police requests, and in keeping with their highest traditions of honoring the law, and honoring law enforcement.

85.     Most of the wrongdoing that the Government imagines are crimes, is laid out in communications to which Mr. Harrelson was never privy and had no access nor means of access. Mr. Harrelson never had Facebook or Twitter accounts.  In this 5th Superseding Indictment, it is indisputable that he would have **not had access** to Facebook rants of no relevance or import engaged in by his alleged co-conspirators, and that are, in any event, First Amendment protected.

86.     So Mr. Harrelson could not have received, nor could anyone have intended to discuss, important "Capitol insurrection" operations or amphibious landing plans with Harrelson through the Facebook platform, because he was not on the Facebook platform.  Therefore, underwhelming paragraphs 46, 48, 49, 55, 57, 61, 67, 68, 75, and 157, like the balance of the entire Indictment, should be screened from the Court's analysis of Harrelson's risk to the community, and flight risk.  Anyone discussing any of those things that required coordination would have been without the necessary knowledge of or coordination by Harrelson.

87.     Prosecution's lack of comprehension or understanding about the Americans charged in this Indictment and what is legal and Constitutionally protected conduct is breathtaking.

88.     The prosecution asserts that the act of peacefully entering the Capitol—an act engaged in by thousands as documented in hundreds of hours of sealed videotape showing what look like Disney World crowds—should see these Americans magically transformed into charged, despised, and dehumanized insurrectionists:  Personally destroyed in courtrooms; stripped of their

---

[43] https://www.dropbox.com/sh/oyyu5ub8b59p1cv/AADYThPHdLYpKLFzvjwZ0cgwa?dl=0

humanity outside courtrooms by elected officials, law enforcement officials and media—worthy of pre-trial detention under the strictest conditions—and now, as we learn that these American citizens may have been pretexted and entrapped by Governmental agencies playing the role of Spider, we also know that taken in sum, these factors have resulted in dramatic public misperceptions about what actually happened.  Or, this Court can just review the videotapes of what Harrelson was actually doing, to determine that he posed no threat, nor engaged in any crimes.

**H.     Entire Spectacle as it Relates to Defendant's Risk Analysis is based on False Premise**

89.     Overt Acts 40 through 43, about codefendant Watkins whom Ken met briefly for the first time on January 6th, has no connection to Ken Harrelson.

90.     Factoring out the Facebook paragraphs of constitutionally protected comments that he was not privy to, Harrelson enters the overt acts on an organizational theory in paragraph 44 (Codefendant Graydon Young was "looking to get involved in helping…") and in paragraph 45 around statements of someone not willing to rely on the Government's long tradition of not illegally spying on American's communications.  Some would argue, and counsel argues, that this is evidence of good historical scholarship and good sense, rather than conspiracy.

91.     Paragraphs 46 through 62 do not involve or include Mr. Harrelson, but feature hyperbolic language to describe ordinary situations and events protected by the First Amendment, and thus are actually exculpatory.  Unless, of course, the prosecution thinks the scheme was to organize a military force of over 1 million peaceful protestors (paragraph 57) to launch a military operation, all while complying with gun laws ("You guys going to carry?..."OK we aren't either, we have a heavy QRF 10 Min out though")!

92.     Aside from being compressed and carried across Capitol thresholds by crowds not

properly managed by Capitol Police, the Oath Keepers complied with all laws and acted in all respects lawfully.  By all appearances, they were invitees at the door they entered into, which in their awareness was opened outward from the inside, possibly by a crowd welcomed in by Capitol Police, which necessitated cooperation by the crowd

## I. **Media Coverage of Untoward Statements by Department of Justice Officials to Media and Selective Disclosures of NSFW Video Has Poisoned the Well**

93.      On March 24, 2021, this Court questioned statements[44] made by Acting U.S. Attorney for the District of Columbia, Michael Sherwin, wherein he referred to this case and described the Government's evidence against these defendants.  He speculated about additional charges, including sedition, which is particularly unconscionable in this case where, by all accounts, the Defendants and former Defendants who have been pressured to plead guilty are loyal and devoted Americans.  Admonitions by this Court appear to have had little effect upon prejudice because Florida State Officials, influenced by overheated press coverage and inflamed by Shermin and other Government agents, seem to think that my client was convicted of treason. This is reprehensible.  This common false perception—a big lie—puts him at continuing risk while at DOC, a facility whose warden was recently held in contempt by a Court in this District.

94.     The Indictment provides inadequate descriptions of Defendant's conduct to justify detention, and when we now compare Government descriptions of Defendant's conduct to what is seen on the actual videotapes, prior Government assertions should be disregarded.

95.     A comparison of statements made by the Government in the first detention hearing (ECF 152-1), descriptive assertions of behavior in the Fifth Superseding Indictment (ECF 347), video surveillance footage, and recovered cellphone videos and cellphone videos obtained from

---

[44] (Docket 100; page 7)

other sources, shows the Government's version of events to be untrue.

96.      After having significant opportunity to review sealed surveillance information, counsel notes that it accurately reflects the Government's failure, in previous hearings, to establish that a presumption favoring detention applies to Mr. Harrelson:  If the Government hasn't already admitted that Mr. Harrelson did not destroy Government property, it should.  The videos and photographs referenced by the Government show, at most, that Mr. Harrelson entered the Capitol building in the middle of a teeming crowd, and wandered somewhat aimlessly around the rotunda.

97.      Mr. Harrelson was not one of the leaders of the Oath Keepers and did not participate in organizing or plotting to stop the certification of the Electoral College vote.  Mr. Harrelson was not prepared to use, and did not use violence, nor planned by himself or with others to "storm" the Capitol.  Mr. Harrelson did not send incriminating chats or messaging, nor delete chats or other messaging with the intent of deleting incriminating evidence, and did not intentionally perjure himself at his initial detention hearing.[45]  The Government's claims to the contrary are unsupported or flatly contradicted by the evidence.  Furthermore, it is normal practice to purge one's handheld hard drive when photos and videos have already been safely uploaded to the cloud for later viewing and sharing.  In fact, if this regular practice is neglected, it causes a handheld device to run out of storage space and thus to cease to function properly.  If

---

[45] His testimony, made without benefit of counsel (ECF 152-1 p. 5, lines 4-8) except for a 15 minute "visit" (Id. p. 6, line 9) and involving a confusing series of events about video files that in all aspects are exculpatory and redundantly backed up in the cloud (although his Capitol videos seem to have uploaded hours after his Capitol walk through that may have contributed to his confusion), creating conflation and confusion and lack of recollection that was openly discussed in the court proceeding (Id. lines p 21, 14-17). The source of this may have been from denied medication (Id. p. 11-12, lines 4-3) where, even when he was treated, caused problems with recollection (Id. p. 21 lines 14-17), but on that day he had untreated high blood pressure (Id. p 22, lines 2-4) and untreated PTSD and he was sleep deprived and confused.  So the government concluded he lied about taking photos even though he clearly knew he was on the front page of a newspaper taking photos. (Id. p 25 line 24 to p. 26 line 12).  Many people experienced malfunctioning phones on January 6 and there are benign explanations for how video clips were only found in the cloud and not on his phone. https://www.pcmag.com/opinions/why-cell-networks-cut-out-at-the-us-capitol-riot

any of the deleted exculpatory content to which the Government is referring was uploaded to any cloud service in use by Mr. Harrelson, this would be exculpatory.

### K.     There is No Evidence That Mr. Harrelson Destroyed Property

98.     Regardless of what has occurred before in regard to the rebuttable presumption of detention as it related to Mr. Harrelson, whether it was initially believed to be the case or whether it was found based on a then inadequate record that probable cause existed to believe he damaged property, there is no evidence of any kind that he did.  Any now we can add to that virtually unbroken videotaped surveillance save for a period that we now know he came to the aid of Officer Dunn

99.     The Government seems to still be relying on felony destruction of property – that is, destruction of property valued at more than $1000 – in seeking to invoke the rebuttable presumption of detention.  ECF 152 at 5.  But by now we have seen the videos and photographs that prove his innocence.  There has been nothing presented on which this Court could find probable cause that he committed that offense.  Moreover, even assuming the presumption did apply, the Court must consider the "weight of the evidence against the person" in determining whether conditions of release will assure his appearance or the safety of the community.[2] *See* 18 USC §3142(g)(2).  The weight of the evidence triggering the presumption of detention weighs heavily in favor of Mr. Harrelson.



*(Note:  The identifications of persons are allegations of the Government.)*

100.    Additional video now clearly shows Mr.Harrelson entering the Capitol in the middle of the swarming crowd and wandering around somewhat aimlessly inside the building. Beyond that, what the Government has offered is unsupported conjecture.

101.    Additionally, evidence from a video recovered from Mr. Harrelson's cell phone makes itperfectly clear that Mr. Harrelson did not plan to storm the Capitol or to disrupt the certificationof the election.  The video was taken from a location on the Capitol terrace at least 100 yards from the Capitol steps leading up to the building.  Early in the video, a person within earshot of Mr. Harrelson is recording exclaiming — "they're storming the…Capitol Building." You see at least one mom and a little girl doing the "storming" that a reasonable person would infer thought they had a legal right to be there.  After the video continues to pan the crowd, a person standing close to Mr. Harrelson says in a quiet voice, "I think we should go, [huh] I think we should go."  It is obvious from the video that no one standing with Mr. Harrelson (or Mr. Harrelson himself) anticipated the events that quickly unfolded.  The video is also convincing

40

evidence that Mr. Harrelson made his decision to join the crowd only moments before the march toward the Capitol began.  Video produced in USAfx, *US v. Caldwell et al*. Discovery/Harrelson Materials/Video 8 MOV.

102.    Furthermore, the government makes much of statements and movements of other Oath Keepers and his direction as they moved through the Capitol as if it can be attributed to Mr. Harrelson or considered as evidence of Mr. Harrelson's intent based totally on conjecture and moon shot extensions of conspiracy law. [46]  Likewise, references to Jessica Watkins' description of an "insurgent effort to breach the Capitol building" and to Signal Chats attributed to other co-conspirators are not evidence of Mr. Harrelson's own actions or his status as a leader, nor that he even viewed postings extoling a forced entry into the Capitol building.  In fact, he met Watkins at the event for the first time.  Indeed, Mr. Harrelson's very occasional appearance as "Gator 6" in the National Signal Chat is neither proof that he viewed much of the inflammatory rhetoric, nor evidence that he shared the views being expressed.

103.    Likewise, his participation in a legal firearms training program in the fall of 2020—well before the election results were known and any of the rallies were planned—has no bearing on whether he was training or preparing to mount an insurrection on the Capitol and might rise to suggestion of selective prosecution based on lawful exercise of Second Amendment Rights. Nor does lawful possession of firearms suggest he poses a threat to an individual or the community. Similarly, the family's possession of survival guides, including one on "eluding pursuers and evading capture" are red herrings, intended to inflame the Court.  The title of that particular one is *The SEAL Operative's Guide to Eluding Pursuers, Evading Capture, and Surviving any Dangerous Situation* by Clint Emerson.  There are millions of military enthusiasts in this country, and since

---

[46] See ECF 152 at 18.  "Harrelson moved south in…direction of the House Chamber…it is reasonable he and his coconspirators [were after] Speaker Pelosi." Actually we know that Harrelson defended Officer Dunn at this time.

Mr. Harrelson is an Army veteran who was interested in security and developing security company training programs, this seems innocuous no matter how much the government commingles it with lawful firearms storage and a "go bag" that was actually a work backpack that, unfortunately for Harrelson, has an old cellphone in it that the government branded a "burner phone."[47]

### K.   The Government Concedes That There Is No Evidence That The Signal Chats Involved The Planning Of Any Unlawful Activity and Now Seems to be Designing a Theory Around Post January 6 conduct none of which is illegal

104.    As previously stated the Government admits that Signal chats play no role in this case. Two Signal Chats referenced by the Government do not show that the participants were planning or anticipating to use force on January 6.   In the Florida Signal Chat cited by the Government, Kelly Meggs refers to a "27 man team" and to 4-5 medics in the group. Mr. Harrelson is also identified as running the ground team.   The chats are consistent with plans to provide protection details at the January 5 and 6 rallies, and in no way suggest the participants were anticipating unauthorized force. Indeed, in the DC OP January 6 Signal Chat, PERSON ONE (an alleged leader of the Oath Keepers) is quoted saying that "Gator [1] and his FL team are already set to provide a PSD [Personal Security Detail] for Roger Stone.

105.    The transcript of the DC OP January 6 Signal Chat begins on December 30, 2020. The first time Mr. Harrelson is even mentioned is on January 3, 2021:

| SYSTEM | 1/3/2021 | 6:02 PM | OK Gator 1 added Kenneth Harrelson |
|---|---|---|---|
| Ok Gator 1 | 1/3/2021 | 6:22 PM | Added Gator 6 Ground Team lead in Florida. He needs to be in the call as well so I will repost. |

---

[47] Id. page 20.

| Ok Gator 1 | 1/3/2021 | 6:22 PM | OK State/team leader meeting<br>Sun, Jan 3, 2021 8:30 PM - 9:30 PM (EST)<br><br>Please joing my meeting from your computer, tablet or smartphone.<br>https://global.gotomeeting.com/join/478058517<br><br>You can also dial in using your phone. (For supported devices, tap a one-touch number below to join instantly.)<br><br>United States: +1 (571) 317-3122<br><br>-One-touch: tel: =15713173122_478058517#<br>Access Code: 478-058-517<br>New to GoToMeeting? Get the app now and be ready when your first meeting starts:<br>https://global.gotomeeting.com/install/478058517 |
|---|---|---|---|

106.    And even though Kelly Meggs added Mr. Harrelson to the chat on 1/3/21, Mr.

Harrelson doesnot appear in the chat transcript again until 1/6/21 at 11:20 PM:

| Kenneth Harrelson | 1/6/2021 | 11:20 PM | This message was deleted. |
|---|---|---|---|
| Kenneth Harrelson* | 1/6/2021 | 11:20 PM | This message was deleted. |
| Kenneth Harrelson* | 1/6/2021 | 11:20 PM | Didn't realize I was in a unsecured chat with a bunch of shit bags |
| Kenneth Harrelson* | 1/6/2021 | 11:23 PM | And blue falcons |

*(presumably no attribution on messages but no one else posted between Harrelson's deleted chat and the next attributed post)*

107.    The Government makes much of routine deletion of messages that everyone must

know in 2021 never can be deleted with the innovation of cloud systems, but transfer and deletion of

files that prove innocence are not evidence of crimes in this case.[48]   Just one possibility is that in

delayed uploading of video files, Harrelson might have received a video clip from someone else

(thinking his camera didn't work) or conflated or misremembered something related to the odd

behavior of his phone. He is accused of being worried about his affiliation with the Oath Keepers

deleting signal messages from the night of January 6th (when there was no evidence that he knew he

_____

[48] ECF 152, p. 22-30 generally

or anyone else knew they were under investigation) and onward, but is this logical when nothing can really be deleted and his activities at that Capitol are all videotaped and his involvement with the Oath Keepers was a matter of public record?  The email exchanges reflect someone who was upset about lack of professionalism from a security standpoint and also someone who was watching overheated press coverage that had all but convicted Oath Keepers of insurrection and treason that he virulently opposes[49]  His angry reaction just confirms that he was not privy to off-line conversations that the government conflates into conspiracy.  He wasn't angry because it was illegal (it wasn't), but because it was unprofessional, disorganized and presented an unflattering picture of the organization.  The government's theory is that these were bad faith efforts to withdraw from a conspiracy that wasn't.  Nothing about his activities was improper or illegal, nothing about his being a member of the Oath Keepers suggests in any way he was extremist or criminal, and efforts to quit the Oath Keepers do not constitute withdrawal from a criminal conspiracy.

### L.    Conclusion

It is respectfully requested that this Court reconsider its earlier motion based on the information set forth herein.  A hearing is requested, should this court seek to deny the relief requested herein which is release with reasonable conditions.

Dated:  November 11, 2021              RESPECTFULLY SUBMITTED

/s/ Brad Geyer
Bradford L. Geyer, PHV
PA 62998
NJ 022751991
Suite 141 Route 130 S.
303
Cinnaminson, NJ 08077
Brad@FormerFedsGroup.Com
(856) 607-5708

---

[49] ECF 152 p. 25

## CERTIFICATE OF SERVICE

I hereby certify that on November 11, 2021, a true and accurate copy of the forgoing was electronically filed and served through the ECF system of the U.S. District Court for the District of Columbia.

/s/ Brad Geyer
Bradford L. Geyer, PHV
PA 62998
NJ 022751991
Suite 141 Route 130 S.
303
Cinnaminson, NJ 08077
Brad@FormerFedsGroup.Com
(856) 607-5708